1   LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   TRAVIS E. DOWNS III (148274)
      BENNY C. GOODMAN III (211302)
3   THOMAS G. WILHELM (234980)
      655 West Broadway, Suite 1900
4   San Diego, CA  92101
      Telephone:  619/231-1058
5   619/231-7423 (fax)
      travisd@lerachlaw.com
6   bgoodman@lerachlaw.com
      twilhelm@lerachlaw.com
7            – and –
      SHAWN A. WILLIAMS (213113)
8   100 Pine Street, Suite 2600
      San Francisco, CA  94111
9   Telephone:  415/288-4545
      415/288-4534 (fax)
10  swilliams@lerachlaw.com

11  Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                    SAN JOSE DIVISION

15  In re NOVELLUS SYSTEMS, INC.      )   No. C-06-03514-RMW
      DERIVATIVE LITIGATION              )
16  _____ )   CONSOLIDATED VERIFIED
                                        )   SHAREHOLDER DERIVATIVE
17  This Document Relates To:          )   COMPLAINT FOR VIOLATION OF
                                        )   FEDERAL SECURITIES LAWS, BREACH
18      ALL ACTIONS.                   )   OF FIDUCIARY DUTIES, GROSS
                                        )   MISMANAGEMENT, AND ACCOUNTING
19  _____ )   AND CALIFORNIA CORPORATIONS
                                        )   CODE SECTIONS 25402 AND 25502.2
20

21                      **REDACTED VERSION**

22

23

24

25

26

27

28

1

**INTRODUCTION AND OVERVIEW**

2     1.     This is a consolidated shareholder derivative action brought by Lead Plaintiff

3 Alaska Electrical Pension Fund ("Alaska Pension") derivatively on behalf of Novellus Systems,

4 Inc. ("Novellus" or the "Company"), against its entire Board of Directors and certain current

5 officers and former top officers and/or directors (collectively, the "Individual Defendants").[1]

6     2.     The action seeks to remedy defendants' violations of federal and California state

7 law, including the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §10(b) of the Securities

8 Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, §14(a) of the

9 Securities Exchange Act, §20 of the Securities Exchange Act, Cal. Corp. Code §§25402, as well

10 as breaches of fiduciary duties, abuse of control, gross mismanagement, constructive fraud, waste

11 of corporate assets, and unjust enrichment between 1996-2006 (the "Relevant Period").

12     3.     Plaintiffs demand an accounting of all stock option grants made to Defendants

13 during times relevant hereto, the rescission of all contracts which provide for stock option grants

14 between any of the Defendants and Novellus which were entered into during times relevant

15 hereto, and a declaration that the illicit stock options, and all proceeds derived from exercise

16 thereof, are and have been held in constructive trust for the Company's benefit.

17     4.     Nominal party Novellus is a California corporation with its principal executive

18 offices located at 4000 North First Street, San Jose, California. Novellus purports to be a leading

19 provider of advanced process equipment for the global semiconductor industry. Novellus

20 manufactures, markets and services advanced deposition, surface preparation and chemical

21 mechanical planarization equipment for advanced integrated circuits. Novellus is headquartered in

22 San Jose, CA. The Company maintains engineering & manufacturing facilities in both San Jose

23 and Tualatin, Oregon, and has sales and service operations in 16 countries around the world.

24

---

25  [1]     The Individual Defendants are Richard S. Hill ("Hill"), Jeffrey C. Benzing ("Benzing"),
26 William H. Kurtz ("Kurtz"), Neil R. Bonke ("Bonke"), Youssef A. El-Mansy ("El-Mansy"), J.
David Litster ("Litster"), Yoshio Nishi ("Nishi"), Glen G. Possley ("Possley"), Ann D. Rhoads
27 ("Rhoads"), William R. Spivey ("Spivey"), Delbert A. Whitaker ("Whitaker"), D. James Guzy
("Guzy"), Tom Long ("Long"), and Robert H. Smith ("Smith").

28

1    5.    During the Relevant Period, the Company's executives and its non-employee
2  directors were compensated in large part through the issuance of stock options. A stock option
3  granted to an employee and/or director of a corporation allows the employee and/or director to
4  purchase company stock at a specified price – referred to as the "exercise price," typically the fair
5  market value of the stock on the date the option is granted. When properly issued, stock options
6  serve as a valuable part of employee and/or director compensation packages as a means to create
7  incentives to boost profitability and stock value. When the employee and/or director exercises the
8  option, he or she purchases the stock from the Company at the exercise price, regardless of the
9  stock's price at the time the option is exercised.

10    6.    Dating back to at least 1997, many of the Individual Defendants engaged in a
11  scheme and course of conduct designed to manipulate Novellus stock option grant dates so as to
12  secretly maximize profits to themselves and other Company executives at the expense of the
13  Company and its shareholders. Specifically, the Individual Defendants, the Board, and senior
14  officers at the Company approved the granting of backdated/misdated stock options in abdication
15  of their fiduciary duties.

16    7.    "Backdating"[2] is a practice by which a stock option is reported as having been
17  granted on one date, but is actually backdated weeks or months to a date where the stock price
18  was trading at a lower price. Such backdating allows Company executives and stock option
19  grantees to realize immediate unearned and undisclosed financial gains at the expense of the
20  Company's shareholders. Backdating of stock option grants has been compared to picking lottery
21  numbers on the day after the winning numbers are announced, or betting on a horse after the race
22  has finished. Arthur Levitt, a former chairman of the Securities and Exchange Commission
23  ("SEC") was quoted as stating that stock option backdating "represents the ultimate in greed."[3]

24

25  [2]    Plaintiffs' use of the terms "backdating," "misdating," "backdated," and "misdated"
26  throughout this Complaint may also refer to other forms of related stock option manipulation
perpetrated by defendants in this action.

27  [3]    For all citations, emphasis has been added and citations and quotations omitted, unless
28  otherwise indicated.

1 Further, Levitt stated, "It is stealing, in effect. *It is ripping off shareholders in an*

2 *unconscionable way*." On May 5, 2006, President George W. Bush stated in an interview on the

3 Kudlow & Company show airing on CNBC that "overcompensating or trying to backdate things

4 is bad for America, and there ought to be consequences when people don't tell the truth and are

5 not transparent."

6      8.     In addition, former SEC Chairman Harvey Pitt has opined that the backdating of

7 stock options often involves the falsification of documents for personal gain:

8      Many discussions of backdating options start with the observation that
     backdating is not, per se, illegal. *That is wrong. Options backdating*
9      *frequently involves falsification of records used to gain access to*
     *corporate assets.* That conduct violates the Foreign Corrupt Practices Act
10      and its internal controls requirements. If corporate directors were
     complicit in these efforts, state law fiduciary obligations are violated.
11      *Backdating is not only illegal and unethical, it points to a lack of*
     *integrity in a company's internal controls.*

12

13      9.     Furthermore, backdating stock options creates an instant paper gain to grantees

who receive them because the options were really priced below the stock's fair market value when
14
they were actually awarded. Under Generally Accepted Accounting Principles ("GAAP"), this
15
instant paper gain is equivalent to paying extra compensation and thus is a cost to Novellus.
16
Accordingly, Novellus was required to record an expense on its financial statements for any
17
options granted below the fair market value on the grant date of the option, or "in the money"
18
options. However, the Individual Defendants did not properly record these known costs on
19
Novellus' financial statements, causing Novellus' financial statements throughout the Relevant
20
Period to be issued in violation of GAAP. Specifically, these financial statements overstated
21
reported earnings and understated reported expenses.
22

23      10.     In addition to defendants' clear breach of fiduciary duty and violation of

accounting rules, defendants' backdating of stock options may have extremely serious tax
24
consequences for the Company. While stock options generally qualify for favorable tax
25
treatment, options issued at a discount to the market price do not qualify for that treatment.
26
Accordingly, backdated stock options are automatically disqualified from that favorable tax relief,
27
and Novellus may owe millions of dollars in unpaid taxes.
28

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION     3
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

11.     Between 1996 and May 2006, Defendants also caused Novellus to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by Novellus carried with them an exercise price that was not less than the fair market value of Novellus stock on the date of grant and issuance.

12.     In fact, Defendants were aware that the practices employed by the Board allowed stock option grants to be backdated to dates when the Company's shares were trading at or near the lowest price for that Relevant Period. Defendants' backdating scheme yielded stock option grants to the Company's executive officers worth millions of dollars, contributing to their ability to sell over $128 million worth of Novellus stock during the Relevant Period.

13.     Novellus' financial results as reported and filed with the SEC were false. Defendants' misrepresentations and wrongful course of conduct violated the Exchange Act, as well as state law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused Novellus to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior Novellus executives; and (iii) subjected Novellus to potential liability from regulators, including the SEC and the IRS.

14.     Defendants' gross mismanagement and malfeasance over the past decade has exposed Novellus and its senior executives to potential criminal and civil liability for issuing false and misleading financial statements. Specifically, defendants caused or allowed Novellus to issue statements that failed to disclose or misstated the following: (i) that the Company had material weaknesses with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of Novellus' earnings and earnings per share.

15.     Defendants' malfeasance and mismanagement during the Relevant Period has wreaked substantial damage on Novellus. The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds. Defendants' breaches of

1  fiduciary duties in the administration of the Company's stock option plans polluted the plans with

2  grant date manipulations so as to undermine the validity of all grants made pursuant to the plans.

3  Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew

4  material non-public information regarding Novellus' internal control problems, abused their

5  fiduciary relationship with the Company by selling over $128 million worth of their personally

6  held shares at artificially inflated prices during the Relevant Period.

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| BENZING | 11/25/96-2/26/04 | 689,390 | $24,105,814 |
| EL-MANSY | 5/12/2006 | 1,667 | $40,323 |
| HILL | 2/27/96-6/6/03 | 3,053,005 | $98,837,495 |
| LITSTER | 11/9/99-5/4/06 | 52,117 | $1,972,498 |
| POSSLEY | 11/22/96-11/24/98 | 110,250 | $1,561,518 |
| SPIVEY | 4/27/01-6/6/03 | 37,800 | $1,646,861 |
| TOTAL | | 3,944,229 | $128,164,509 |

This action seeks recovery for Novellus against these so-called fiduciaries, as Novellus' Board of

Directors, as currently composed, is simply unable and unwilling to do so.

**Illegal Backdating at Novellus Revealed**

16.     On May 16, 2006, the Center for Financial Research and Analysis ("CFRA")

issued a report: "Options Backdating – Which Companies Are at Risk?" The report identified the

risks for companies that have taken part in options backdating:

- SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

1      17.     On May 22, 2006, Merrill Lynch published a report entitled "Options Pricing –
2  Hindsight is 20/20." The report contained an analysis of options grant timing for the
3  semiconductor and semiconductor equipment companies that compromise the Philadelphia
4  Semiconductor Index.  The report focused on identifying companies where stock option grants
5  preceded large increases in a Company's stock price. In this analysis, Novellus was ranked fourth
6  and labeled a "standout company" in terms of companies with excess returns following grant
7  dates – *i.e.*, companies that were likely to have backdated stock options.

8      18.     Remarkably, the same day that the Merrill Lynch report was released, on May 22,
9  2006, Novellus issued a press release denying the implications of the report and stating "that it has
10  reviewed a Merrill Lynch report regarding options pricing in the semiconductor industry.
11  Novellus has reviewed its process of granting options *to the named executive officers* in the
12  report and has not found any irregularities."

13      19.     However, the Company's hasty review of their granting practices and denials of
14  backdating did not quiet speculation surrounding the highly suspicious timing of some of their
15  options grants.

16      20.     On May 25, 2006, Merrill Lynch issued an expanded report including a total of 47
17  companies in the semiconductor industry. Novellus was still ranked near the top of the list—now
18  at ninth place. The report stated that "[t]he results are notable—for the 1997-2002 interval that we
19  studied, the stocks in our coverage universe have consistently generated excess returns during the
20  20-day period following options grants. It is difficult to avoid concluding that the timing of
21  options pricing for the period we studied has been very advantageous for the executives that
22  received options."

23      21.     On June 19, 2006, a Standard & Poor's analyst expressed similar concerns:

24      Our review of Novellus Systems proxy filings and related research indicates that
        the 12/16/1999 stock options grant was followed by an upward revision to
25      guidance that drove the stock 33% higher on Monday 12/20/1999. With the
        Securities and Exchange Commission options-backdating investigation now
26      expanding to the timing of news flow, we are concerned that Novellus Systems
        may face exposure to this investigation despite the proximity of the 1999 date to
27      grants in other years. In addition, following changing peer multiples, we believe
        Novellus Systems shares are overvalued, and we are reducing our 12-month target
28      price to $20 from $34.

22.    In October 2006, another research report regarding options backdating was released by The Corporate Library. The Corporate Library is a leading independent source for U.S. corporate governance and executive and director compensation information and analysis. This report examined interlocking relationships between directors and executives at 51 companies that had been implicated in options backdating reports. In particular, it analyzed how the practice of backdating stock options could have spread between the companies now implicated in the scandal. The report showed that many of the companies involved in the scandal had directors and executives in common that could have spread the practice throughout the companies. The Corporate Library determined that Novellus was one of the three most central companies in terms of connections to other implicated companies. *See* ¶¶177(i).

23.    Repeating their blanket denials in response to The Corporate Library report, Novellus was quoted in an October 19, 2006 article in CFO.com, as saying:

> Novellus has not been implicated in any wrongdoing with regard to stock options backdating. Novellus has *always* filed its financial reports on time. In addition, Novellus reviewed its processes with two legal firms, internal and external auditors and its Board of Directors. The company issued a press release on May 22, 2006 stating that the company reviewed its process of granting options and did not find any irregularities.

24.    As discussed below, however, at ¶¶83, 86, this too was false and misleading as throughout the Relevant Period Defendants filed Form 4's with the SEC well after the prescribed time, thereby facilitating the concealment of backdating stock options.

25.    Most recently, on November 17, 2006, in an awkwardly worded disclosure, Novellus announced that their principal accounting officer was being replaced:

> In connection with the appointment of William H. Kurtz as the principal accounting officer of the Company, described in Item 5.02(c) below, Thomas R. Foy, who had been the principal accounting officer, was replaced by Mr. Kurtz as the principal accounting officer, effective November 13, 2006. Mr. Kurtz remains the Company's Executive Vice President and Chief Financial Officer.

**NOVELLUS' DOCUMENTS SHOW CLEAR IRREGULARITIES IN THE COMPANY'S OPTION GRANTING PRACTICES**

26.      On September 8, 2006, this Court held a Case Management Conference during which it consolidated the two derivative actions brought against Novellus, and ordered defendants to complete their Rule 26 initial disclosures within 21 days.

27.      ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

28.      ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████ that:

"[t]he exercise price of all stock options granted under the Option Plan must equal at least the fair market value of the Common Stock of the Company on the date of grant. The fair market value of the Common Stock on a given date is determined by the Board of Directors based upon the last sale price of the Common Stock on the Nasdaq National Market System as of such date."

████One of the suspicious grants is a 100,000 options grant to defendant Hill on January 2, 1997. On that date, the closing price of Novellus stock was at its lowest for the first quarter of 1997 – $55.50. A document entitled ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[4]      In 2001, the Stock Option Committee and the Compensation Committee merged to become the Stock Option and Compensation Committee. Unless otherwise noted, references to the "Stock Option Committee" refer to the Stock Option Committee and/or the Stock Option and Compensation Committee.



1
2
3
4
5
6
7
8
9
10
11
12    31.
13
14
15
16
17
18
19

20    32.    In the face of this strong evidence of backdating, Novellus' Directors and
21 Executives have refused to take any action to pursue these claims on behalf of the Company.
22 Instead, they have issued repeated and unsubstantiated denials, which will only cause further harm
23 to the Company. There is simply no way for Novellus, based upon these documents, to conclude
24 that the granting process at Novellus was in line with representations in the Company's proxy
25 statements that the stock option exercise prices reflected the fair market value of Novellus stock
26 on the date they were granted. Instead, the documents together with the extremely fortuitous
27 timing of certain options grants, show a strong likelihood that options grants were in fact
28 backdated.

1    33.    Indeed, the backdating of stock options will cause Novellus substantial tax and
2  regulatory liability, and the Company will need to expend significant resources associated with
3  the following:

4              (a)    costs incurred to carry out internal investigations, including legal fees paid
5  to outside counsel, accounting firms and consultants;

6              (b)    costs incurred from increased directors' and officers' insurance premiums
7  as a result of the illegally manipulated stock option grants;

8              (c)    costs incurred from directing manpower to correct Novellus' defective
9  internal controls;

10             (d)    costs incurred from directing manpower away from other projects in order
11 to restate Novellus' financial results;

12             (e)    costs associated with the Company's unpaid taxes resulting from the
13 backdating of stock options; and

14             (f)    costs already incurred and that will continue to be incurred to respond to
15 investigations by the Attorney General and SEC.

16                          **JURISDICTION AND VENUE**

17    34.    The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Exchange
18 Act, 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated
19 thereunder, and under California law for breach of fiduciary duty, abuse of control, constructive
20 fraud, corporate waste, unjust enrichment and gross mismanagement. In connection with the acts,
21 conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means
22 and instrumentalities of interstate commerce, the United States mail and the facilities of a national
23 securities market.

24    35.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15
25 U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337. This Court also has supplemental
26 jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

27    36.    This action is not a collusive one to confer jurisdiction on a court of the United
28 States which it would not otherwise have.

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION          10
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1       37.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C.

2  §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation

3  and dissemination of materially false and misleading information, occurred in substantial part in

4  this District. Novellus is located in and conducts its business in this District. Further, Defendants

5  conduct business in this District, and certain of the Defendants are citizens of California and

6  reside in this District.

7                               **PARTIES**

8       38.    Lead Plaintiff Alaska Electrical Pension Fund was during the Relevant Period a

9  shareholder of Novellus, and continues to be a shareholder of Novellus.

10       39.    Nominal party Novellus is a California corporation with its principal executive

11  offices located at 4000 North First Street, San Jose, California.

12       40.    Defendant Richard S. Hill has been Chief Executive Officer ("CEO") and a

13  director of Novellus since 1993. In May 1996, Hill was appointed Chairman of the Board.

14  Because of Hill's positions, he knew the adverse non-public information about the business of

15  Novellus, as well as its finances, markets and present and future business prospects, via access to

16  internal corporate documents, conversations and connections with other corporate officers and

17  employees, attendance at management and Board meetings and committees thereof and via reports

18  and other information provided to him in connection therewith. During the Relevant Period, Hill

19  participated in the issuance of false and/or misleading statements, including the preparation of the

20  false and/or misleading press releases and SEC filings. Based on his knowledge of material non-

21  public information regarding the Company, defendant Hill violated Cal. Corp. Code §§25402 and

22  25502.5 by selling over 3 million shares of Novellus stock for proceeds of $98.8 million during

23  the Relevant Period.

24       41.    Defendant Jeffrey C. Benzing is currently Vice President and Chief Business

25  Officer of Novellus, a position he has held since March 2004. Previously, Benzing served as

26  Director of Special Projects in November 1988, when he joined the Company. From July 1992

27  through June 1999, he served as Novellus' Vice President in charge of Product Development.

28  From July 1999 through December 2001, he served as Executive Vice President, Systems

1 Development, Engineering and Manufacturing Operations and from January 2002 through
2 February 2004, he served as Executive Vice President of the Deposition Business Group, until he
3 was elected to his current position with Novellus. Because of Benzing's positions, he knew the
4 adverse non-public information about the business of Novellus, as well as its finances, markets
5 and present and future business prospects, via access to internal corporate documents,
6 conversations and connections with other corporate officers and employees, attendance at
7 management meetings and via reports and other information provided to him in connection
8 therewith. During the Relevant Period, Benzing participated in the issuance of false and/or
9 misleading statements, including the preparation of the false and/or misleading press releases and
10 SEC filings. Based on his knowledge of material non-public information regarding the Company,
11 defendant Benzing violated Cal. Corp. Code §§25402 and 25502.5 by selling 689,390 shares of
12 Novellus stock for proceeds of $24.1 million during the Relevant Period.

13     42. Defendant William H. Kurtz has been Chief Financial Officer ("CFO") and
14 Executive Vice President of Novellus since September 2005. Because of Kurtz's position, he
15 knew the adverse non-public information about the business of Novellus, as well as its finances,
16 markets and present and future business prospects, via access to internal corporate documents,
17 conversations and connections with other corporate officers and employees, attendance at
18 management meetings and via reports and other information provided to him in connection
19 therewith. During the Relevant Period, Kurtz participated in the issuance of false and/or
20 misleading statements, including the preparation of the false and/or misleading press releases and
21 SEC filings.

22     43. Defendant Neil R. Bonke has been a director of Novellus since April 2004.
23 Because of Bonke's position, he knew the adverse non-public information about the business of
24 Novellus, as well as its finances, markets and present and future business prospects, via access to
25 internal corporate documents, conversations and connections with other corporate officers and
26 employees, attendance at Board meetings and committees thereof and via reports and other
27 information provided to him in connection therewith. During the Relevant Period, Bonke
28 participated in the issuance of false and/or misleading statements, including the preparation of the

1   false and/or misleading press releases and SEC filings. As a member of the Audit Committee,

2   defendant Bonke caused or allowed the dissemination of the improper public statements described

3   herein.

4        44.    Defendant Youssef A. El-Mansy has been a director of Novellus since 2004.

5   Because of El-Mansy's position, he knew the adverse non-public information about the business

6   of Novellus, as well as its finances, markets and present and future business prospects, via access

7   to internal corporate documents, conversations and connections with other corporate officers and

8   employees, attendance at Board meetings and committees thereof and via reports and other

9   information provided to him in connection therewith. During the Relevant Period, El-Mansy

10   participated in the issuance of false and/or misleading statements, including the preparation of the

11   false and/or misleading press releases and SEC filings. As a member of the Compensation and

12   Governance and Nominating Committees, defendant El-Mansy controlled the other Defendants'

13   stock option awards and caused or allowed the dissemination of the improper public statements

14   described herein. Based on his knowledge of material non-public information regarding the

15   Company, defendant El-Mansy violated Cal. Corp. Code §§25402 and 25502.5 by selling 1,667

16   shares of Novellus stock for proceeds of $40,323 during the Relevant Period.

17        45.    Defendant J. David Litster has been a director of Novellus since February 1998.

18   Because of Litster's position, he knew the adverse non-public information about the business of

19   Novellus, as well as its finances, markets and present and future business prospects, via access to

20   internal corporate documents, conversations and connections with other corporate officers and

21   employees, attendance at Board meetings and committees thereof and via reports and other

22   information provided to him in connection therewith. During the Relevant Period, Litster

23   participated in the issuance of false and/or misleading statements, including the preparation of the

24   false and/or misleading press releases and SEC filings. As a member of the Compensation and

25   Governance and Nominating Committees, defendant Litster controlled the other Defendants'

26   stock option awards and caused or allowed the dissemination of the improper public statements

27   described herein. Based on his knowledge of material non-public information regarding the

28

1 Company, defendant Litster violated Cal. Corp. Code §§25402 and 25502.5 by selling 52,117
2 shares of Novellus stock for proceeds of nearly $2 million during the Relevant Period.

3      46.    Defendant Yoshio Nishi has been a director of Novellus since 2002. Because of
4 Nishi's position, he knew the adverse non-public information about the business of Novellus, as
5 well as its finances, markets and present and future business prospects, via access to internal
6 corporate documents, conversations and connections with other corporate officers and employees,
7 attendance at Board meetings and committees thereof and via reports and other information
8 provided to him in connection therewith. During the Relevant Period, Nishi participated in the
9 issuance of false and/or misleading statements, including the preparation of the false and/or
10 misleading press releases and SEC filings. As a member of the Compensation and Governance
11 and Nominating Committees, defendant Nishi controlled the other Defendants' stock option
12 awards and caused or allowed the dissemination of the improper public statements described
13 herein.

14      47.    Defendant Glen G. Possley has been a director of Novellus since July 1991.
15 Because of Possley's position, he knew the adverse non-public information about the business of
16 Novellus, as well as its finances, markets and present and future business prospects, via access to
17 internal corporate documents, conversations and connections with other corporate officers and
18 employees, attendance at Board meetings and committees thereof and via reports and other
19 information provided to him in connection therewith. As a member of the Audit Committee,
20 defendant Possley caused or allowed the dissemination of the improper public statements
21 described herein. During the Relevant Period, Possley participated in the issuance of false and/or
22 misleading statements, including the preparation of the false and/or misleading press releases and
23 SEC filings. Based on his knowledge of material non-public information regarding the Company,
24 defendant Possley violated Cal. Corp. Code §§25402 and 25502.5 by selling 110,250 shares of
25 Novellus stock for proceeds of nearly $1.6 million during the Relevant Period.

26      48.    Defendant Ann D. Rhoads has been a director of Novellus since 2003. Because of
27 Rhoads's positions, she knew the adverse non-public information about the business of Novellus,
28 as well as its finances, markets and present and future business prospects, via access to internal

1    corporate documents, conversations and connections with other corporate officers and employees,
2    attendance at Board meetings and committees thereof and via reports and other information
3    provided to her in connection therewith.  During the Relevant Period, Rhoads participated in the
4    issuance of false and/or misleading statements, including the preparation of the false and/or
5    misleading press releases and SEC filings.  As a member of the Audit Committee, defendant
6    Rhoads caused or allowed the dissemination of the improper public statements described herein.

7         49.    Defendant William R. Spivey has been a director of Novellus since April 1998.
8    Because of Spivey's position, he knew the adverse non-public information about the business of
9    Novellus, as well as its finances, markets and present and future business prospects, via access to
10   internal corporate documents, conversations and connections with other corporate officers and
11   employees, attendance at Board meetings and committees thereof and via reports and other
12   information provided to him in connection therewith.  During the Relevant Period, Spivey
13   participated in the issuance of false and/or misleading statements, including the preparation of the
14   false and/or misleading press releases and SEC filings.  As a member of the Compensation and
15   Governance and Nominating Committees, defendant Spivey controlled the other Defendants'
16   stock option awards and caused or allowed the dissemination of the improper public statements
17   described herein.  Based on his knowledge of material non-public information regarding the
18   Company, defendant Spivey violated Cal. Corp. Code §§25402 and 25502.5 by selling 37,800
19   shares of Novellus stock for proceeds of $1.6 million during the Relevant Period.

20        50.    Defendant Delbert A. Whitaker has been a director of Novellus since 2002.
21   Because of Whitaker's position, he knew the adverse non-public information about the business of
22   Novellus, as well as its finances, markets and present and future business prospects, via access to
23   internal corporate documents, conversations and connections with other corporate officers and
24   employees, attendance at Board meetings and committees thereof and via reports and other
25   information provided to him in connection therewith.  During the Relevant Period, Whitaker
26   participated in the issuance of false and/or misleading statements, including the preparation of the
27   false and/or misleading press releases and SEC filings.  As a member of the Audit, Compensation
28   and  Governance  and  Nominating  Committees,  defendant  Whitaker  controlled  the  other

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION          15
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1 | Defendants' stock option awards and caused or allowed the dissemination of the improper public

2 | statements described herein.

3 |     51.    Defendant D. James Guzy was a director at Novellus from 1990 until 2004.

4 | Because of Guzy's position, he knew the adverse non-public information about the business of

5 | Novellus, as well as its finances, markets and present and future business prospects, via access to

6 | internal corporate documents, conversations and connections with other corporate officers and

7 | employees, attendance at Board meetings and committees thereof and via reports and other

8 | information provided to him in connection therewith. During his tenure at Novellus, Guzy served

9 | on the Audit, Compensation, Stock Option, and Stock Option and Compensation Committees.[5]

10 | As a member of these committees, defendant Guzy controlled the other Defendants' stock option

11 | awards and caused or allowed the dissemination of the improper public statements described

12 | herein. During the Relevant Period, Guzy participated in the issuance of false and/or misleading

13 | statements, including the preparation of the false and/or misleading press releases and SEC filings.

14 |     52.    Defendant Tom Long was a director at Novellus from 1995 until 2001. Because of

15 | Long's position, he knew the adverse non-public information about the business of Novellus, as

16 | well as its finances, markets and present and future business prospects, via access to internal

17 | corporate documents, conversations and connections with other corporate officers and employees,

18 | attendance at Board meetings and committees thereof and via reports and other information

19 | provided to him in connection therewith. During his tenure at Novellus, Long served on the

20 | Audit, Compensation, Stock Option, and Stock Option and Compensation Committees. As a

21 | member of these committees, defendant Long controlled the other Defendants' stock option

22 | awards and caused or allowed the dissemination of the improper public statements described

23 | herein. During the Relevant Period, Long participated in the issuance of false and/or misleading

24 | statements, including the preparation of the false and/or misleading press releases and SEC filings.

25

26

27 | [5]    The Stock Option Committee and the Compensation Committee combined into the Stock Option and Compensation Committee in 1997.

28

1       53.    Defendant Robert H. Smith was a director of Novellus from 1995 to 2002.  In

2   1996, Smith became Executive Vice President for Finance and Administration, as well as CFO.

3   As CFO and EVP for Finance and Administration, Smith was heavily involved in the options

4   granting process at Novellus.  Because of Smith's position, he knew the adverse non-public

5   information about the business of Novellus, as well as its finances, markets and present and future

6   business prospects, via access to internal corporate documents, conversations and connections

7   with other corporate officers and employees, attendance at Board meetings and committees

8   thereof and via reports and other information provided to him in connection therewith.  During the

9   Relevant Period, Smith participated in the issuance of false and/or misleading statements,

10  including the preparation of the false and/or misleading press releases and SEC filings.

11                       **DEFENDANTS WERE CONTROL PERSONS**

12              **WITH FIDUCIARY DUTIES TO NOVELLUS**

13      54.    Each officer and director of Novellus named herein owed the Company and

14  Novellus shareholders the duty to exercise a high degree of care, loyalty and diligence in the

15  management and administration of the affairs of the Company, as well as in the use and

16  preservation of its property and assets.  The conduct of Novellus' directors and officers

17  complained of herein involves knowing, intentional and culpable violations of their obligations as

18  officers and directors of Novellus.  Further, the misconduct of Novellus' officers has been ratified

19  by Novellus' Board, which has failed to take any legal action on behalf of the Company against

20  them.

21      55.    By reason of their positions as officers, directors and fiduciaries of Novellus, and

22  because of their ability to control the business and corporate affairs of the Company, the

23  Defendants owed Novellus and its shareholders fiduciary obligations of candor, trust, loyalty and

24  care, and were required to use their ability to control and manage Novellus in a fair, just, honest

25  and equitable manner, and to act in furtherance of the best interests of Novellus and its

26  shareholders so as to benefit all shareholders equally and not in furtherance of their personal

27  interest or benefit.  In addition, as officers and/or directors of a publicly held company, the

28  Defendants had a duty to refrain from utilizing their control over Novellus to divert assets to

1  themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly
2  disseminate accurate and truthful information with respect to the Company's operations, earnings
3  and compensation practices.

4       56.    Because of their positions of control and authority as directors or officers of
5  Novellus, each of the Defendants was able to and did, directly and indirectly, control the wrongful
6  acts complained of herein.  As to the Director Defendants, these acts include: (i) agreement to
7  and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause Novellus
8  to disseminate false Proxy Statements for 1997-2006, which Proxy Statements failed to disclose
9  Defendants' option backdating scheme and omitted the fact that executive officers were allowed
10 to backdate their stock option grants in order to manipulate the strike price of the stock options
11 they received.  Because of their positions with Novellus, each of the Defendants was aware of
12 these wrongful acts, had access to adverse non-public information and was required to disclose
13 these facts promptly and accurately to Novellus shareholders and the financial markets but failed
14 to do so.

15      57.    Between 1997 and 2006, Defendants repeated in each Proxy Statement that the
16 stock option grants made during that period carried an exercise price that was not less than the fair
17 market value of Novellus stock on the date granted, as calculated by the public trading price of the
18 stock at the market's close on that date.  However, Defendants concealed that the stock option
19 grants were repeatedly and consciously backdated to ensure that the strike price associated with
20 the option grants was at or near the lowest trading price for that fiscal period.  Due to Defendants'
21 breach of their fiduciary duty in the administration of the stock option plans, plaintiffs seek to
22 have the directors' and officers' plans voided and gains from those plans returned to the
23 Company.  In the alternative, plaintiffs seek to have all of the unexercised options granted to
24 Defendants between 1997 and 2006 cancelled, the financial gains obtained via the exercise of
25 such options returned to the Company and to have Defendants revise the Company's financial
26 statements to reflect the truth concerning these option grants.

27      58.    To discharge their duties, the directors of Novellus were required to exercise
28 reasonable and prudent supervision over the management, policies, practices and controls of the

business and financial affairs of Novellus.  By virtue of such duties, the officers and directors of Novellus were required, among other things, to:

        (a)     manage, conduct, supervise and direct the business affairs of Novellus in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Novellus);

        (b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of Novellus to engage in self-dealing;

        (c)     neither violate nor knowingly permit any officer, director or employee of Novellus to violate applicable laws, rules and regulations;

        (d)     remain informed as to the status of Novellus' operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

        (e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

        (f)     establish and maintain systematic and accurate records and reports of the business and affairs of Novellus and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

        (g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Novellus' financial statements -- including its expenses, accounting for stock option grants and other financial information -- would be accurate and the actions of its directors would be in accordance with all applicable laws;

1    (h)    exercise control and supervision over the public statements to the securities
2  markets and trading in Novellus stock by the officers and employees of Novellus; and

3    (i)    supervise the preparation and filing of any financial reports or other
4  information required by law from Novellus and to examine and evaluate any reports of
5  examinations, audits or other financial information concerning the financial affairs of Novellus
6  and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the
7  subjects and duties set forth above.

8    59.    Each Defendant, by virtue of his or her position as a director and/or officer, owed
9  to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise
10  of due care and diligence in the management and administration of the affairs of the Company, as
11  well as in the use and preservation of its property and assets. The conduct of the Defendants
12  complained of herein involves a knowing and culpable violation of their obligations as directors
13  and/or officers of Novellus, the absence of good faith on their part, and a reckless disregard for
14  their duties to the Company and its shareholders which Defendants were aware or should have
15  been aware posed a risk of serious injury to the Company. The conduct of the Defendants who
16  were also officers and/or directors of the Company during the Relevant Period has been ratified by
17  the Director Defendants who comprised Novellus' Board during the Relevant Period.

18    60.    Defendants breached their duties of loyalty and good faith by allowing or by
19  themselves causing the Company to misrepresent its financial results and prospects, as detailed
20  herein infra, and by failing to prevent the Defendants from taking such illegal actions. As a result,
21  Novellus has expended and will continue to expend significant sums of money.    Such
22  expenditures include, but are not limited to:

23    (a)    improvidently paid executive compensation;

24    (b)    increased capital costs as a result of the loss of market capitalization and the
25  Company's damaged reputation in the investment community;

26    (c)    costs incurred to carry out internal investigations, including legal fees paid
27  to outside counsel; and

28    (d)    incurring possible IRS penalties for improperly reporting compensation.

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION    20
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1    61.    These actions have irreparably damaged Novellus' corporate image and goodwill.
2  For at least the foreseeable future, Novellus will suffer from what is known as the "liar's
3  discount," a term applied to the stocks of companies who have been implicated in illegal behavior
4  and have misled the investing public, such that Novellus' ability to raise equity capital or debt on
5  favorable terms in the future is now impaired.

6  **AIDING AND ABETTING AND CONCERTED ACTION**

7    62.    In committing the wrongful acts alleged herein, Defendants have pursued or joined
8  in the pursuit of a common course of conduct and acted in concert with one another in furtherance
9  of their common plan.

10    63.    During all times relevant hereto, Defendants collectively and individually initiated
11  a course of conduct which was designed to and did: (i) conceal the fact that the Company was
12  allowing its directors and senior officers to divert hundreds of millions of dollars to Novellus
13  insiders and directors and causing Novellus to misrepresent its financial results; (ii) maintain
14  Defendants' executive and directorial positions at Novellus and the profits, power and prestige
15  which Defendants enjoyed as a result of these positions; (iii) deceive the investing public,
16  including shareholders of Novellus, regarding Defendants' compensation practices and Novellus'
17  financial performance.

18    64.    The purpose and effect of Defendants' common course of conduct was, among
19  other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of
20  control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse
21  information concerning the Company's operation and financial condition and to artificially inflate
22  the price of Novellus common stock so they could dispose of millions of dollars of their own
23  Novellus stock, and enhance their executive and directorial positions and receive the substantial
24  compensation they obtained as a result thereof.

25    65.    Defendants accomplished their common enterprise and/or common course of
26  conduct by causing the Company to purposefully and/or recklessly engage in the option
27  backdating scheme alleged herein and misrepresent Novellus' financial results.  Each of the

28

1 Defendants was a direct, necessary, and substantial participant in the common enterprise and/or
2 common course of conduct complained of herein.

3     66.    Each of the Defendants aided and abetted and rendered substantial assistance in
4 the wrongs complained of herein. In taking such actions to substantially assist the commission of
5 the wrongdoing complained of herein, each Defendant acted with knowledge of the primary
6 wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his
7 or her overall contribution to and furtherance of the wrongdoing.

8                                    **FACTUAL ALLEGATIONS**

9     67.    Nominal party Novellus is a California corporation with its principal executive
10 offices located at 4000 North First Street, San Jose, California. Novellus purports to be a leading
11 provider of advanced process equipment for the global semiconductor industry. Novellus
12 manufactures, markets and services advanced deposition, surface preparation and chemical
13 mechanical planarization equipment for advanced integrated circuits. Novellus is headquartered in
14 San Jose, CA. The company maintains engineering & manufacturing facilities both San Jose and
15 Tualatin, Oregon, and has sales and service operations in 16 countries around the world.

16     68.    During the Relevant Period the Company's executives and its non-employee
17 directors were compensated in large part though the issuance of stock options. A stock option
18 granted to an employee and/or director of a corporation allows the employee and/or director to
19 purchase company stock at a specified price – referred to as the "exercise price" – for a specified
20 period of time. Stock options are granted as part of employee and/or director compensation
21 packages as a means to create incentives to boost profitability and stock value. When the
22 employee and/or director exercises the option, he or she purchases the stock from the company at
23 the exercise price, regardless of the stock's price at the time the option is exercised. If the
24 exercise price is lower than it should be, the employee and/or director pays less and the company
25 gets less when the stock option is exercised.

26     69.    According to the Company, stock options are issued pursuant to Stock Option
27 Plans approved by Company shareholders and administered by the Company's Board and Stock
28 Option and Compensation Committee. Each of Novellus' reported Stock Option Plans provides

1  that the measurement of the exercise price of stock options was to be based on the fair market
2  value on the date the option was granted. *See*, proxies, *infra*.

3       70.     Contrary to representations in public filings with the SEC and to Company
4  shareholders, the Individual Defendants manipulated stock options by falsifying or manipulating
5  documents evidencing stock option grant dates. Instead of stock options being priced in
6  accordance with the fair market value on the grant date of the options, the options were backdated
7  to – in most instances – reflect a date on which the fair market value of the stock was lower than
8  that of the date of the actual grant. In most instances, stock options were backdated to a date
9  where the fair market value of the stock was at its lowest during a relevant month or quarter. The
10  actual practice of granting stock options to Novellus officers and/or directors was contrary to the
11  terms of each of Novellus' Stock Option Plans. When the Novellus options were backdated to
12  lower their exercise price for the benefit of Company insiders, the salutary purpose of the Stock
13  Option Plans was undermined to the detriment of the Company and its shareholders, as the
14  recipients of the options received compensation regardless of whether they achieved the goals that
15  would otherwise be a prerequisite to their benefiting from such compensation.

16       71.     The backdating of options granted to Company insiders also brought an instant
17  paper gain to these insiders, as the options were priced below the stock's fair market value when
18  they were actually awarded. Under GAAP, this instant paper gain was equivalent to extra
19  compensation and, thus, represented a cost to Novellus. Because defendants caused Novellus to
20  omit quarterly and year-end costs associated with this extra compensation in its financial results,
21  its profits were overstated during the fiscal periods in which the options were granted.

22                               **SUSPICIOUS GRANTS DURING THE RELEVANT PERIOD**

23       72.     From at least 1997 until 2006, Defendants caused the Company to issue stock
24  options that were dated suspiciously to either coincide with the lowest trading price of the
25  Company's stock during the month in which they were granted, or to precede a significant rise in
26  Novellus' stock price.

27

28

1

**1997 Option Grants**

2      73.     Defendants dated many of Novellus' 1997 option grants as of January 2, 1997 at

3  $9.25 per share (adjusted for stock split) – the low of the month.  The stock traded as high as

4  $13.23 per share in December.  Defendant Hill received 100,000 options at this price.  Moreover,

5  the documentation surrounding this grant only authorizes the granting of 50,000 options to Hill

6  and was signed well after the grant date.  *See* ¶¶154-156.

7

8



Novellus Systems
December 2, 1996 - February 3, 1997

21

22

23

24

25

26

27

28

**1998 Option Grants**

74.     Defendants dated Novellus' 1998 option grants at or near the low of the month in which the options were granted. Defendants dated many of Novellus' grants as of September 21, 1998 at $7.90 per share (adjusted for stock split) – the low of the month. The stock traded as high as $9.42 per share in September. Defendant Hill received 92,000 options at this price. *See* ¶158. Defendants also dated many of Novellus' grants as of December 17, 1998 at $16.42 per share (adjusted for stock split) – nearly the low of the month when the stock traded between $15.88 and $19.31 per share. Defendant Benzing received 50,000 options at this price. Former CFO Smith, former President Peter Hanley ("Hanley") and EVP John A. Chenault ("Chenault") received 45,000, 40,000 and 60,000 options, respectively, at this price.



**1999 Option Grants**

75.     Defendants dated Novellus' 1999 option grants at or near the low of the month in which the options were granted. Defendants dated some of Novellus' grants as of January 4, 1999 at $17.33 per share – the low of the month. The stock traded as high as $24.79 per share in January. Defendant Hill received 56,250 options at this price. *See* ¶159. Defendants also dated some of Novellus' grants as of August 19, 1999 at $19.15 per share – nearly the low of the month when the stock traded between $18.14 and $22.00 per share. Former executive Chenault received 79,500 options at this price. Defendants further dated many of Novellus' grants as of December 16, 1999 at $25.56 per share – nearly the low of the month when the stock traded between $24.83 and $41.21 per share. Defendant Benzing received 120,000 options at this price. Former executives Smith and Hanley received 135,000 and 120,000 options, respectively, at this price.



**2000 Option Grants**

76.     Defendants dated Novellus' 2000 option grants on December 15, 2000 at $30.25 per share.  This grant, like many of Defendants' other grants, occurred right before a large increase in Novellus' stock price.  By January 17, 2001 – 20 trading days out – the stock had closed at $44.38 per share, a sharp increase of 47%.  Defendant Hill received 300,000 options at this price.  Former executives Smith, Hanley, Chenault and William van den Hoek ("van den Hoek"), an EVP of Novellus, received 145,280, 159,800, 94,400 and 106,700 options, respectively, at this price.



**Novellus Sought and Received Shareholder Approval Through the Issuance of False and Misleading Proxy Statements**

77.     Throughout the Relevant Period, Novellus filed proxy statements with the SEC that contained false and misleading statements about the Company's stock option plans.

78.     At the time that the following proxy statements were filed, the members of the Board of Directors, and particularly the members of the Stock Option Committee, knew or should have known that the disclosures in the proxy statements regarding stock option compensation and practices were false and misleading as they failed to disclose that stock options were, in many cases, backdated.

**Novellus' False Proxy Statement**

79.     On or around April 18, 1995 Novellus filed a Form 14A Proxy Statement with the SEC.   In its 1995 Proxy Statement, the Board stated that "[t]he Stock Option Committee administers the issuance of stock and the grant of options to purchase stock of the Company pursuant to the Company's stock plans and, in accordance with the terms of the respective stock plans, determines the terms and conditions of such issuances and grants."

80.     The Board further described the exercise price of stock option grants as being equal to the fair market value of the Company stock on the date of the grant:

> "[t]he exercise price of all stock options granted under the Option Plan must equal at least the fair market value of the Common Stock of the Company on the date of grant. The fair market value of the Common Stock on a given date is determined by the Board of Directors based upon the last sale price of the Common Stock on the Nasdaq National Market System as of such date."

**Novellus' False Proxy Statement**

81.     On or around April 22, 1996 Novellus filed a Form 14A Proxy Statement with the SEC.   In its 1996 Proxy Statement, the Board stated that "[t]he Stock Option Committee [consisting of Guzy, Long, Smith and Poppelen] administers the issuance of stock and the grant of options to purchase stock of the Company pursuant to the Company's stock plans and, in accordance with the terms of the respective stock plans, determines the terms and conditions of such issuances and grants."   The Board further stated that, "[t]he exercise price of all stock options granted under the [1992 Stock] Option Plan must equal at least the fair market value of the

1   Common Stock of the Company on the date of grant. The fair market value of the Common Stock

2   on a given date is determined by the Board of Directors based upon the last sale price of the

3   Common Stock on the Nasdaq National Market System as of such date."

4       82.    In the same Proxy Statement, the Board assured shareholders that no action could

5   be taken to reduce the exercise price of an option without shareholder approval:

6           "[i]n March of 1996 the Board approved an amendment to the Option Plan
            which provides that the Stock Option Committee may not, without further
7           approval of the shareholders of the Company, authorize the amendment of any
            outstanding option to reduce the option price or authorize the amendment of any
8           outstanding stock appreciation right ("SAR") to reduce the base price."

9       83.    Finally, with respect to Defendants' Section 16(a) compliance, the Board stated

10  that "Mr. Robert Graham ["Graham"], Chairman of the Board, and Mr. Richard S. Hill, President

11  and Chief Executive Officer, each filed one late Form 4 with respect to one transaction."[6]

12  **Novellus' False 1997 Proxy Statement**

13      84.    On or around April 22, 1997 Novellus filed a Form 14A Proxy Statement with the

14  SEC. In its 1997 Proxy Statement, the Board stated that the Stock Option Committee administers

15  the issuance of stock and the grant of options to purchase stock of the Company pursuant to the

16  Company's stock plans and, in accordance with the terms of the respective stock plans, determines

17  the terms and conditions of such issuances and grants.

18      85.    The Board again stated that "[t]he exercise price of all stock options granted under

19  the [1992 Stock] Option Plan ***must equal at least the fair market value of the Common Stock of***

20  ***the Company on the date of grant***. The fair market value of the Common Stock on a given date

21  is determined by the Board of Directors based upon the last sale price of the Common Stock on

22  the Nasdaq National Market System as of such date."

23      86.    Regarding Defendants' Section 16(a) compliance, the Board stated that Mr. Robert

24  Wagner filed one late Form 4.

25  _____

26  [6]      Several studies of potential options backdating have noted that the late filing on Form 4's
    can help facilitate backdating. Moreover, Novellus' October 19, 2006 statement that Novellus
27  "always" filed its financial reports on time apparently did not take into account these late filings.

28

1    87.    The Board further described the duties of the Stock Option Committee of the Board

2  of Directors and the responsibilities concerning stock option issuances and adherence to the terms

3  of the stock option plan:

4         [T]he Option Plan currently is administered by the Stock Option Committee
        of the Board of Directors (the "Stock Option Committee"), which, subject to the
5       terms of the Option Plan, determines the terms of the options granted under the
        Option Plan, including the exercise price, the number of shares subject to the
6       option and exercisability.

7                          *         *         *

8         ***The exercise price of all stock options granted under the Option Plan must
        equal at least the fair market value of the Common Stock of the Company on the***
9       ***date of grant.*** The fair market value of the Common Stock on a given date is
        determined by the Board of Directors based upon the last sale price of the
10      Common Stock on the Nasdaq National Market System as of such date.

11 **Novellus' False 1998 Proxy Statement**

12     88.    On or around April 14, 1998 Novellus filed a Form 14A Proxy Statement with the

13  SEC.  In its 1998 Proxy Statement, the Board stated that "[t]he Stock Option Committee

14  administers the issuance of stock and the grant of options to purchase stock of the Company

15  pursuant to the Company's stock plans and, in accordance with the terms of the respective stock

16  plans, determines the terms and conditions of such issuances and grants."  The Board further

17  assured that stock option grants were equal to the fair market value of the stock on the date of the

18  grant:

19        ***The exercise price of all stock options granted under the Option Plan must equal
        at least the fair market value of the Common Stock of the Company on the date***
20      ***of grant.*** The fair market value of the Common Stock on a given date is
        determined by the Board of Directors based upon the last sale price of the
21      Common Stock on the Nasdaq National Market System as of such date.

22 **Novellus' False 1999 Proxy Statement**

23     89.    On or around April 7, 1999 Novellus filed a Form 14A Proxy Statement with the

24  SEC. In its 1999 Proxy Statement, the Board stated that "[t]he Stock Option and Compensation

25  Committee administers the issuance of stock and the granting of options to purchase stock of the

26  Company pursuant to the Company's stock plans and, in accordance with the terms of the

27  respective stock plans, determines the terms and conditions of such issuances and grants. In

28  addition, it reviews and approves the Company's executive compensation policy."

1    90.    Further, the Board stated that "the exercise price of all stock options granted under
2  the [1992 Stock] Option Plan *must equal at least the fair market value of the Common Stock of*
3  *the Company on the date of grant*. The fair market value of the Common Stock on a given date
4  is determined by the Board of Directors based upon the last sale price of the Common Stock on
5  the Nasdaq National Market System as of such date."

6    91.    The Board also stated that in connection with the 1992 Stock Option Plan, "[i]n the
7  case of a Nonstatutory Stock Option . . . granted to a Named Executive, the per share *exercise*
8  *price shall be no less than 100% of the Fair Market Value per Share on the date of grant*."

9  **Novellus' False 2000 Proxy Statement**

10    92.    On or around April 7, 2000 Novellus filed a Form 14A Proxy Statement with the
11  SEC. In its 2000 Proxy Statement, the Board stated that "[t]he Stock Option and Compensation
12  Committee administers the issuance of stock and the granting of options to purchase stock of the
13  Company pursuant to the Company's stock plans and, in accordance with the terms of the
14  respective stock plans, determines the terms and conditions of such issuances and grants. In
15  addition, it reviews and approves the Company's executive compensation policy."

16    93.    Further, the Board further stated that "[t]he exercise price of all stock options
17  granted under the [1992 Stock] Option Plan must equal at least the fair market value of the
18  Common Stock of the Company on the date of grant. The fair market value of the Common Stock
19  on a given date is determined by the Board of Directors based upon the last sale price of the
20  Common Stock on the Nasdaq National Market System as of such date."

21  **Novellus' False 2001 Proxy Statement**

22    94.    On or around April 11, 2001 Novellus filed a Form 14A Proxy Statement with the
23  SEC. In its 2001 Proxy Statement, the Board stated that "The Stock Option and Compensation
24  Committee administers the issuance of stock and the granting of options to purchase stock of the
25  Company pursuant to the Company's stock plans and, in accordance with the terms of the
26  respective stock plans, determines the terms and conditions of such issuances and grants. In
27  addition, it reviews and approves the Company's executive compensation policy." The 2001
28  Proxy Statement also stated that the Plan authorizes the Administrator to grant awards at an

1 | exercise price determined by the Administrator, however, such price must not be less than one
2 | hundred percent (100%) (or one hundred ten percent (110%), in the case of Incentive Stock
3 | Options granted to any Grantee who owns stock representing more than ten percent (10%) of the
4 | combined voting power of the Company or any Parent or Subsidiary of the Company) of the Fair
5 | Market Value of the Common Stock on the date the Option is granted.

6 | **Novellus' False 2002 Proxy Statement**

7 | 95.    On or around April 9, 2002 Novellus filed a Form 14A Proxy Statement with the
8 | SEC. In its 2002 Proxy Statement, the Board stated that "The Stock Option and Compensation
9 | Committee administers the issuance of stock and the granting of options to purchase stock of the
10 | Company pursuant to the Company's stock plans and, in accordance with the terms of the
11 | respective stock plans, determines the terms and conditions of such issuances and grants. In
12 | addition, it reviews and approves the Company's executive compensation policy."

13 | **Novellus' False 2003 Proxy Statement**

14 | 96.    On or around March 7, 2003, Novellus filed a Form 14A Proxy Statement with the
15 | SEC. In its 2003 Proxy Statement, the Board stated that "***stock options issued under the 2001***
16 | ***Plan shall have an exercise price of not less than 100% of the fair market value of the Common***
17 | ***Stock on the date of grant of the option***." The Board further stated that "[s]tock options shall be
18 | issued under the 2001 Non-Qualified Plan with an exercise price of not less than 100% of the fair
19 | market value of the Common Stock on the date of grant of the option."

20 | **Novellus' False 2004 Proxy Statement**

21 | 97.    On or around March 12, 2004, Novellus filed a Form 14A Proxy Statement with
22 | the SEC. In its 2004 Proxy Statement, the Board stated that "***stock options issued under the 2001***
23 | ***Plan shall have an exercise price of not less than 100% of the fair market value of the Common***
24 | ***Stock on the date of grant of the option***." The Board further stated that "[s]tock options shall be
25 | issued under the 2001 Non-Qualified Plan with an exercise price of not less than 100% of the fair
26 | market value of the Common Stock on the date of grant of the option."

27
28

**Novellus' False 2005 Proxy Statement**

98.    On or around March 17, 2005, Novellus filed a Form 14A Proxy Statement with the SEC. In its 2005 Proxy Statement, the Board stated that "[t]he stock options issued under the 2001 Plan have an exercise price of not less than 100% of the fair market value of the Common Stock on the date of grant of the option." The Board further stated that "stock options shall be issued under the 2001 Non-Qualified Plan with an exercise price of not less than 100% of the fair market value of the Common Stock on the date of grant of the option."

**Novellus' False 2006 Proxy Statement**

99.    On or around April 17, 2006, Novellus filed a Form 14A Proxy Statement with the SEC. In its 2006 Proxy Statement, the Board made the following representations about the administration of the Company's stock option plan:

> The Board of Directors and the Stock Option and Compensation Committee believe that stock option grants are inherently performance-based, since their eventual value to the recipient is directly linked to Novellus' stock price, which is largely driven by company performance. The option grants awarded in recent years vest ratably over a four-year period from the date of grant. For any value to be derived from an option grant, Novellus' performance needs to be at a level that, in comparison to the industry and the overall stock market, continues to drive increased stock price performance and shareholder value over a period of years. *If the price of Novellus' stock does not exceed the grant price before the option's term expires, the option will become worthless.* In addition, restricted stock awards may be designed to be performance-based, if shares are forfeited when a performance target is not met after a specific period of time.

100.    In describing the Company's 2001 Stock Incentive Plan, the Board stated that "[t]he stock options issued under the 2001 Plan have an exercise price of not less than 100% of the fair market value of the Common Stock on the date of grant of the option."

101.    In describing the Company's 2001 Non-Qualified Stock Option Plan, the Board stated that "stock options shall be issued under the 2001 Non-Qualified Plan with an exercise price of not less than 100% of the fair market value of the Common Stock on the date of grant of the option."

**NOVELLUS' FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP**

102.    As a result of Defendants' improper backdating of stock options, Defendants caused Novellus to violate GAAP, SEC regulations and IRS rules and regulations.

1    103.    Novellus' financial results for 1996-2006 were included in reports filed with the
2 SEC and in other shareholder reports.  In these reports, defendants represented that Novellus'
3 financial results were presented in a fair manner and in accordance with GAAP.

4    104.    Defendants' representations were false and misleading as to the financial
5 information reported, as such financial information was not prepared in conformity with GAAP,
6 nor was the financial information "a fair presentation" of the Company's financial condition and
7 operations, causing the financial results to be presented in violation of GAAP and SEC rules.

8    105.    GAAP consists of those principles recognized by the accounting profession as the
9 conventions, rules, and procedures necessary to define accepted accounting practice at the
10 particular time.  Regulation S-X, to which the Company is subject as a registrant under the
11 Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC
12 which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

13 **Violations of GAAP**

14    106.    During the Relevant Period, Defendants caused the Company to understate its
15 compensation expense by not properly accounting for its stock options under GAAP and thus
16 overstated the Company's net earnings.

17    107.    Under well-settled accounting principles in effect throughout the Relevant Period,
18 Novellus did not need to record an expense for options granted to employees at the then-current
19 market price ("at the money").  The Company was, however, required to record an expense in its
20 financial statements for any options granted below the then-current market price ("in the money").
21 In order to provide Novellus executives and employees with far more lucrative "in the money"
22 options, while avoiding having to inform shareholders about millions of dollars incurred by the
23 Company in compensation expenses (and without paying the IRS millions of dollars in
24 employment taxes), defendants systematically falsified Company records to create the false
25 appearance that options had been granted at the market price on an earlier date.

26    108.    Throughout the Relevant Period, Novellus accounted for stock options using the
27 intrinsic method described in Accounting Principles Board Opinion ("APB") No. 25, "Accounting
28 for Stock Issued to Employees."  Under APB No. 25, employers were required to record as an

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION          34
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1   expense on their financial statements the "intrinsic value" of a fixed stock option on its
2   "measurement date." An option that is "in the money" on the measurement date has intrinsic
3   value, and the difference between its exercise price and the quoted market price must be recorded
4   as compensation expense to be recognized over the vesting period of the option. Options that are
5   "at the money" or "out of the money" on the measurement date need not be expensed. Excluding
6   non-employee directors, APB No. 25 required employers to record compensation expenses on
7   options granted to non-employees irrespective of whether they were "in the money" or not on the
8   date of grant.

9   **Novellus' GAAP Violations Were Material**

10      109.    Novellus' false and misleading Relevant Period statements and omissions
11   regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC
12   Staff Accounting Bulletin ("SAB") Topic 1M, "Materiality," summarizes GAAP definitions of
13   materiality.    Among other items, SAB Topic 1M says: "A matter is 'material' if there is a
14   substantial likelihood that a reasonable person would consider it important." It also stresses that
15   materiality requires qualitative, as well as quantitative, considerations. For example, if a known
16   misstatement would cause a significant market reaction that reaction should be taken into account
17   in determining the materiality of the misstatement.

18   **SAB Topic 1M further states:**

19              Among the considerations that may well render material a quantitatively
            small misstatement of a financial statement item are –
20
                                        *        *        *
21
        •       whether the misstatement masks a change in earnings or other trends
22
        •       whether the misstatement hides a failure to meet analysts' consensus expectations
23              for the enterprise

24                                      *        *        *

25      •       whether the misstatement concerns a segment or other portion of the registrant's
                business that has been identified as playing a significant role in the registrant's
26              operations or profitability.

27      110.    SAB Topic 1M also says that an intentional misstatement of even immaterial items

28   may be illegal and constitute fraudulent financial reporting.

**Novellus' Financial Statements Violated Fundamental Concepts of GAAP**

111.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, 10);

(b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, 34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, 40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, 58-59);

(f)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, 79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, 95, 97).

1    112.    Further, the undisclosed adverse information concealed by defendants during the

2  Relevant Period is the type of information which, because of SEC regulations, regulations of the

3  national stock exchanges and customary business practice, is expected by investors and securities

4  analysts to be disclosed, and is known by corporate officials and their legal and financial advisors

5  to be the type of information which is expected to be and must be disclosed.

6  **Violations of the SEC Regulations**

7    113.    During the Relevant Period, Defendants caused Novellus to violate SEC

8  regulations by failing to disclose that the Company's senior executives had been granted

9  backdated stock options.

10    114.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

11  must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item

12  402(b) and (c) require a company to provide both a Summary Compensation Table and an

13  Option/SAR Grants Table identifying the compensation of the named executive officers – the

14  Company's CEO and its next four most highly paid executives. Item 402 requires particularized

15  disclosures involving a company's stock option grants in the last fiscal year. In the summary

16  compensation table, the issuer must identify in a column "other annual compensation" received by

17  the named executives that is not properly categorized as salary or bonus, including any "[a]bove

18  market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid

19  to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer

20  must identify in a column "[t]he per-share exercise or base price of the options . . . . If such

21  exercise or base price is less than the market price of the underlying security on the date of grant,

22  a separate, adjoining column shall be added showing market price on the date of grant." Item

23  402(c)(2)(iv).

24    115.    Defendants caused Novellus to violate SEC regulations by failing to disclose that

25  the Company's named executive officers had been granted options with exercise prices below the

26  market value on the date the Board or Compensation Committee approved the grant.

27

28

**Violations of IRS Rules and Regulations**

116.    During the Relevant Period, defendants further caused Novellus to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated exposing Novellus to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

117.    Defendants caused the Company to violate IRS Code §162(m) which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based." In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

118.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162(m)] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

119.    Defendants caused Novellus to violate IRS Code §162(m) by providing backdated options to the Company's named executive officers which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

120.    Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon

1  the exercise of Novellus' stock options by improperly accounting for its Non-qualified Stock
2  Options ("NQSOs") as Incentive Stock Options ("ISOs").

3        121.    ISOs are a form of equity compensation that may be provided to a company's
4  employees. ISOs are required to be granted at an exercise price that is no less than the fair market
5  value of the stock on the date of the grant and are entitled to preferential tax treatment as they are
6  not subject to income tax upon exercise of the options but only upon sale of the stock (except for
7  the possible imposition of alternative minimum tax on the option spread at the time of exercise).
8  Stock options that do not qualify as ISOs are considered to be NQSOs. NQSOs are not entitled to
9  preferential treatment as they are subject to income tax and FICA withholding upon exercise. As
10  a result, a company that fails to withhold income tax and/or FICA upon the exercise of NQSOs by
11  its employees would be liable for the amount of the income tax and FICA that the company failed
12  to withhold upon exercise of the options, in addition to interest and penalties.

13        122.    By improperly treating its backdated options as ISOs, defendants failed to provide
14  proper income tax and FICA withholdings upon the exercise of its options by its executives and
15  employees in violation of IRS rules and regulations.

16        123.    The chart below illustrates Novellus' false and misleading fiscal year financial
17  results which materially understated its compensation expenses and thus overstated its earnings
18  due to improper backdating of stock options:

| FISCAL YEAR | REPORTED EARNINGS (LOSS) (in thousands) | REPORTED BASIC EARNINGS (LOSS) PER SHARE |
|---|---|---|
| 1995 | $82,543 | $4.82 |
| 1996 | $94,029 | $5.70 |
| 1997 | $(95,658) | $(0.96) |
| 1998 | $52,828 | $0.50 |
| 1999 | 76,574 | $0.64 |
| 2000 | $151,065 | $1.12 |
| 2001 | $144,470 | $0.97 |
| 2002 | $22,920 | $0.15 |
| 2003 | $(67,814) | $(0.45) |
| 2004 | $156,690 | $1.06 |
| 2005 | $110,107 | $0.80 |

1  **Novellus' Form 10-K Filings for the Relevant Period Were False and Misleading**

2      124.    Throughout the Relevant Period, the members of the Novellus Board of Directors

3  either knew, or should have known, that Novellus was filing false and misleading Forms 10-K

4  with the SEC. The Forms 10-K included false financial statements and misrepresented the options

5  granting practices at Novellus.

6  **The 1995 Form 10-K**

7      125.    On or about March 20, 1996, the Company filed its 1995 Form 10-K with the SEC.

8  The 1995 Form 10-K was signed by Hill, Wall, Graham, Guzy, Long, Possley, Smith and Van

9  Poppelen. The 1995 Form 10-K was simultaneously distributed to shareholders and the public.

10  The 1995 Form 10-K included Novellus' 1995 financial statements which were materially false

11  and misleading and presented in violation of GAAP, due to improper accounting for the backdated

12  stock options. The Company also stated that it accounts for its stock option plans and its

13  employee stock purchase plan in accordance with provisions of APB No. 25. As a result,

14  Novellus' compensation expense was understated and its net earnings were overstated.

15  **The 1996 Form 10-K**

16      126.    On or about March 20, 1997, the Company filed its 1996 Form 10-K with the SEC.

17  The 10-K was signed by Hill, Wall, Graham, Long, Possley, Smith and Van Poppelen. The 1996

18  Form 10-K was simultaneously distributed to shareholders and the public. The 1996 Form 10-K

19  included Novellus' 1996 financial statements which were materially false and misleading and

20  presented in violation of GAAP, due to improper accounting for the backdated stock options. The

21  Company also stated that it accounts for its stock option plans and its employee stock purchase

22  plan in accordance with provisions of  APB No. 25. As a result, Novellus' compensation expense

23  was understated and its net earnings were overstated.

24  **The 1997 Form 10-K**

25      127.    On or about March 9, 1998, the Company filed its 1997 Form 10-K with the SEC.

26  The 1998 Form 10-K was signed by Hill, Smith, Guzy, Long, Possley, Litster, and Spivey. The

27  1997 Form 10-K was simultaneously distributed to shareholders and the public. The 10-K was

28  signed by Hall, Wall, Graham, Long, Possley, Smith and Van Poppelen. The 1997 Form 10-K

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION          40
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

Case 5:06-cv-03514-RMW   Document 47   Filed 12/08/06   Page 42 of 75


1   included Novellus' 1997 financial statements which were materially false and misleading and

2   presented in violation of GAAP, due to improper accounting for the backdated stock options. The

3   Company also stated that it accounts for its stock option plans and its employee stock purchase

4   plan in accordance with provisions of APB No. 25. As a result, Novellus' compensation expense

5   was understated and its net earnings were overstated.

6   **The 1998 Form 10-K**

7        128.    On or about March 10, 1999, the Company filed its 1998 Form 10-K with the SEC.

8   The 1998 Form 10-K was simultaneously distributed to shareholders and the public. The 1998

9   Form 10-K included Novellus' 1998 financial statements which were materially false and

10   misleading and presented in violation of GAAP, due to improper accounting for the backdated

11   stock options. The Company also stated that it accounts for its stock option plans and its

12   employee stock purchase plan in accordance with provisions of APB No. 25. As a result,

13   Novellus' compensation expense was understated and its net earnings were overstated.

14   **The 1999 Form 10-K**

15        129.    On or about March 30, 2000, the Company filed its 1999 Form 10-K with the SEC.

16   The 1999 Form 10-K was simultaneously distributed to shareholders and the public. The 1999

17   Form 10-K included Novellus' 1999 financial statements which were materially false and

18   misleading and presented in violation of GAAP, due to improper accounting for the backdated

19   stock options. The Company also stated that it accounts for its stock option plans and its

20   employee stock purchase plan in accordance with provisions of APB No. 25. As a result,

21   Novellus' compensation expense was understated and its net earnings were overstated. As a

22   result, Novellus' compensation expense was understated and its net earnings were overstated.

23        130.    The 1999 Form 10K made the following false and misleading statement:

24       Employee Stock Option Plans. The Company grants options to employees under
the 1984 and 1992 Stock Option Plans ("the Plans"). Under the Plans, options to

25       purchase up to 16.2 million shares of the Company's *common stock may be
granted at not less than fair market value*.

26

27       The Form 10-K405 was signed by Smith, Michael Dodson, Hill, Guzy, Long, Possley,

Litster and Spivey.

28

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION    41
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

**The 2000 Form 10-K**

131.    On or about March 23, 2001, the Company filed its 2000 Form 10-K with the SEC. The 2000 Form 10-K was signed by Hill, Smith, Royal, Guzy, Long, Possley, Litster, and Spivey. The 2000 Form 10-K was simultaneously distributed to shareholders and the public. The 2000 Form 10-K included Novellus' 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. The Company also stated that it accounts for its stock option plans and its employee stock purchase plan in accordance with provisions of APB No. 25. As a result, Novellus' compensation expense was understated and its net earnings were overstated.

132.    The 2001 Form 10K made the following false and misleading statement:

Employee Stock Option Plans. Novellus grants options to employees under the 1992 Stock Option Plan (the "Plan"). Under the Plan, options *to purchase up* to *33.3 million shares of Novellus common stock may be granted at not less than fair market value.*

**The 2001 Form 10-K**

133.    On or about March 21, 2002, the Company filed its 2001 Form 10-K with the SEC. The 2001 Form 10-K was simultaneously distributed to shareholders and the public. The 2001 Form 10-K included Novellus' 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. The Company also stated that it accounts for its stock option plans and its employee stock purchase plan in accordance with provisions of APB No. 25. As a result, Novellus' compensation expense was understated and its net earnings were overstated.

The Form 10-K was signed by Hill, Smith, Kevin S. Royal ("Royal"), Guzy, Long, Litster, Spivey and Possley.

**The 2002 Form 10-K**

134.    On or about March 5, 2003, the Company filed its 2002 Form 10-K with the SEC. The 2002 Form 10-K was signed by Hill, Royal, Guzy, Possley, Litster, Spivey, Whitaker, Rhoads, and Nishi. The 2002 Form 10-K was simultaneously distributed to shareholders and the public. The 2002 Form 10-K included Novellus' 2002 financial statements which were materially

1   false and misleading and presented in violation of GAAP, due to improper accounting for the

2   backdated stock options. As a result, Novellus' compensation expense was understated and its net

3   earnings were overstated.

4       135.   The 2003 Form 10K made the following false and misleading statements:

5   Employee Stock Option Plans.  Novellus grants options to employees under the
    1992 Stock Option Plan (the "Plan").  Under the Plan, options *to purchase up to*

6   *33.3 million shares of Novellus common stock may be granted at not less than*
    *fair market value.*

7   **The 2003 Form 10-K**

8       136.   On or about March 12, 2004, the Company filed its 2003 Form 10-K with the SEC.

9   The 2003 Form 10-K was simultaneously distributed to shareholders and the public.  The 2003

10  Form 10-K included Novellus' 2003 financial statements which were materially false and

11  misleading and presented in violation of GAAP, due to improper accounting for the backdated

12  stock options.  The Company also stated that it accounts for its stock option plans and its

13  employee stock purchase plan in accordance with provisions of APB No. 25.  As a result,

14  Novellus' compensation expense was understated and its net earnings were overstated.

15      137.   The 2003 Form 10K made the following false and misleading statements:

16

17  We grant options to employees under several stock option plans.  Under the 1992
    Stock Option Plan, which expired in fiscal 2002, options to purchase up to 33.3
    million shares of Novellus common stock were made available *for grant at not*

18  *less than fair market value.*

19      The Form 10-K was signed by Hill, Royal, Guzy, Litster, Nishi, Possley, Spivey, Rhoades

20  and Whitaker.

21  **The 2004 Form 10-K**

22      138.   On or about March 15, 2005, the Company filed its 2004 Form 10-K with the SEC.

23  The 2004 Form 10-K was signed by Hill, Royal, Litster, Nishi, Possley, Spivey, Bonke, El-

24  Mansy, Rhoads and Whitaker.  The 2004 Form 10-K was simultaneously distributed to

25  shareholders and the public.  The 2004 Form 10-K included Novellus' 2004 financial statements

26  which were materially false and misleading and presented in violation of GAAP, due to improper

27  accounting for the backdated stock options.  As a result, Novellus' compensation expense was

28  understated and its net earnings were overstated.

1     139.    The 2004 Form 10K made the following false and misleading statements:

2     Stock-Based Compensation. We account for stock-based employee compensation
      using the intrinsic value method under Accounting Principles Board Opinion No.
3     25, Accounting for Stock Issued to Employees, or APB No. 25, and have adopted
      the disclosure-only provisions of Statement of Financial Accounting Standards
4     No. 123, Accounting for Stock-Based Compensation, or SFAS No. 123, as
      amended by SFAS No. 148, Accounting for Stock-Based Compensation "
5     Transition and Disclosures. Accordingly, no expense has been recognized for
      options granted to employees at fair value.

6
      Employee Stock Option Plans
7
              We grant options to employees under several stock option plans. Under
8     the 1992 Stock Option Plan, which expired in fiscal 2002, options to purchase up
      to 33,300,000 shares of Novellus common stock were made *available for grant at
9     not less than fair market value.*

10    **The 2005 Form 10-K**

11    140.    On or about March 16, 2006, the Company filed its 2005 Form 10-K with the SEC.

12    The 2005 Form 10-K was signed by Hill, Kurts, Foy, Bonke, El-Mansy, Listster, Nishi, Possley,

13    Rhoads, Spivey and Whitaker.   The 2005 Form 10-K was simultaneously distributed to

14    shareholders and the public. The 2005 Form 10-K included Novellus' 2005 financial statements

15    which were materially false and misleading and presented in violation of GAAP, due to improper

16    accounting for the backdated stock options.  As a result, Novellus' compensation expense was

17    understated and its net earnings were overstated.

18    141.    The 2005 Form 10K made the following false and misleading statement:

19    Employee Stock Option Plans

20    We grant options to employees under several stock option plans. Under the
      1992 Stock Option Plan, which expired in fiscal 2002, options to purchase up
21    to 33,300,000 shares of Novellus common stock were made available for grant
      at not less than fair market value.

22
      142.    The materially false and misleading 1995-2005 Form 10-Ks described above were
23
      reviewed, prepared and/or endorsed by the Director Defendants.  The 1996-2005 10-Ks were
24
      signed by Defendant Hill as the Chairman of the Board and the CEO of Novellus. He also signed
25
      the 1995 10-K as the President and CEO of Novellus with former director Graham signing as the
26
      Chairman of the Board.  Defendant Kurtz signed the 2005 10-K as CFO.  Former Controller and
27

28

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION     44
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1  CFO Royal signed the 1999-2004 10-Ks and former CFO Smith signed the 1996-2001 10 Ks.
2  Former executive Wall signed the 1995 10-K as the CFO.

3      143.    Then, on May 22, 2006, Novellus' stock dropped as a result of Merrill Lynch
4  issuing an analyst report in which it questioned Novellus' option granting practices for at least the
5  period 1997-2002.

6      144.    During the Relevant Period, the Defendants caused Novellus' shares to trade at
7  artificially inflated levels by issuing a series of materially false and misleading statements
8  regarding the Company's financial statements, business and prospects. Specifically, Defendants
9  caused or allowed Novellus to issue statements that failed to disclose or misstated the following:
10 (i) that the Company had problems with its internal controls that prevented it from issuing
11 accurate financial reports and projections; (ii) that because of improperly recorded stock-based
12 compensation expenses the Company's financial results violated GAAP; and (iii) that the
13 Company's public disclosures presented an inflated view of Novellus' earnings and restated
14 earnings.

15                 **DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

16     145.    The 1997-2006 Proxy Statements concealed Defendants' option backdating
17 scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when
18 voting on proxy proposals between 1996 and 2006.

19     146.    On May 22, 2006, a Merrill Lynch report was published entitled "Options Pricing –
20 Hindsight is 20/20." The report contained an analysis of options grant timing for the
21 semiconductor and semiconductor equipment companies that compromise the Philadelphia
22 Semiconductor Index. They focused on identifying companies where stock option grants preceded
23 large increases in a Company's stock price. In this analysis, Novellus was ranked forth and
24 labeled a "standout company" in terms of companies with excess returns following grant dates—
25 *i.e.*, companies that were likely to have backdated stock options.

26     147.    The same day that the Merrill Lynch report was released, on May 22, 2006,
27 Novellus issued a press release denying the implications of the report. The Company stated "that
28 it has reviewed a Merrill Lynch report regarding options pricing in the semiconductor industry.

1 | Novellus has reviewed its process of granting options to the named executive officers in the report

2 | and has not found any irregularities."

3 | 148.     On May 25, 2006, Merrill Lynch issued an expanded report including a total of 47

4 | companies in the semiconductor industry. Novellus was still ranked near the top of the list—now

5 | at ninth place. The report stated that "[t]he results are notable—for the 1997-2002 Interval that we

6 | studied, the stocks in our coverage universe have consistently generated excess returns during the

7 | 20-day period following options grants. It is difficult to avoid concluding that the timing of

8 | options pricing for the period we studied has been very advantageous for the executives that

9 | received options."

10 | 149.     On June 19, 2006, a Standard & Poor's analyst expressed similar concerns:

11 | Our review of Novellus Systems proxy filings and related research
indicates that the 12/16/1999 stock options grant was followed by an upward
12 | revision to guidance that drove the stock 33% higher on Monday 12/20/1999. With
the Securities and Exchange Commission options-backdating investigation now
13 | expanding to the timing of news flow, we are concerned that Novellus Systems
may face exposure to this investigation despite the proximity of the 1999 date to
14 | grants in other years. In addition, following changing peer multiples, we believe
Novellus Systems shares are overvalued, and we are reducing our 12-month target
15 | price to $20 from $34.

16 | 150.     In October 2006, another research report was released by The Corporate Library.

17 | This report looked at connections between directors and executives at 51 companies that had been

18 | implicated in options backdating.  In particular, it analyzed how the practice of backdating stock

19 | options could have spread between the companies now implicated in the scandal.  The report

20 | showed that many of the companies involved in the scandal had directors and executives in

21 | common that could have spread the practice throughout the companies.  The Corporate Library

22 | determined that Novellus was one of the three most central companies in terms of connections to

23 | other implicated companies.  *See* ¶¶177(i), (j), (k), (l).

24 | 151.     Repeating their blanket denials in response to this report, Novellus was quoted in

25 | an October 19, 2006 article in CFO.com, as saying:

26 | Novellus has not been implicated in any wrongdoing with regard to stock
options backdating. Novellus has always filed its financial reports on time. In
27 | addition, Novellus reviewed its processes with two legal firms, internal and
external auditors and its Board of Directors. The company issued a press release
28 |

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

46

on May 22, 2006 stating that the company reviewed its process of granting options and did not find any irregularities.

152. However, Novellus neglected to say that it had been implicated in potential backdating in three separate reports because of the highly suspect timing of some of its options grants. Further, Novellus has yet to explain how their review of their options granting processes, announced the very same day that the Merrill Lynch report was published, could have eliminated the possibility that backdating did in fact occur.

### INTERNAL NOVELLUS DOCUMENTS SHOW CLEAR IRREGULARITIES IN NOVELLUS' OPTION GRANTING PRACTICES

153. Documents purporting to be approvals of the Board of Directors or the Compensation and Stock Option Committee generally do not identify the dates on which the Board or the Committee actually acted to grant or approve the options – a key factor in determining the actual grant date of the options. Indeed, some of the documents affirmatively show that the Board or Committee did not act to approve the grants until after the grants were already made, despite the Company's policy that "[a]ll stock option grants must have the approval of the Compensation and Stock Option Committee of the Board of Directors".

154. For example, one of the grants challenged in the complaints is a grant of 100,000 options to defendant Hill on January 2, 1997. This grant bears the date with the lowest closing stock price of the first quarter of 1997, $55.50. A document entitled 

The closing stock price on February 3, 1997 was $77.25, a $21.75 increase over the closing price on the reported grant date.

155. Letters from the Company Treasurer to four of the directors dated January 28, 1997, states that they were enclosing

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮  On January 28, 1997 the closing stock price was $75, $19.50 higher than on January 2,

4 1997.

5      156. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮ Defendant Hill was also granted 108,000 options with a grant date of July 18,

14 1998. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22      158. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1          ████  The grant of 18,750 shares on January 4, 1999 to defendant Hill was also made

2    through a document entitled ████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ███████████████████████████████████

10         ███████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████

13         161.    ███████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18                    **TOLLING OF THE STATUTE OF LIMITATIONS**

19         162.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully

20   concealed their manipulation of the stock option plans, through strategic timing and fraudulent

21   backdating, by issuing false and misleading Proxy Statements, by falsely reassuring Novellus'

22   public investors that Novellus' option grants were being administered by a committee of

23   independent directors, and by failing to disclose that backdated options were, in fact, actually

24   issued on dates other than those disclosed, and that strategically timed option grants were issued

25   based on the manipulation of insider information that ensured that the true fair market value of the

26   Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

27

28

1    163.    Novellus' public investors had no reason to know of the Defendants' breaches of

2  their fiduciary duties until May 22, 2006, when Merrill Lynch issued its report detailing the option

3  practices of Novellus.

4    164.    Finally, as fiduciaries of Novellus and its public shareholders, the Defendants

5  cannot rely on any limitations defense where they withheld from Novellus' public shareholders

6  the facts that give rise to the claims asserted herein, i.e., that the Novellus Board had abdicated its

7  fiduciary responsibilities to oversee the Company's executive compensation practices, and that the

8  option grant dates had been manipulated to maximize the profit for the grant recipients and,

9  accordingly, to maximize the costs for the Company.

10                    **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

11    165.    Plaintiffs bring this action derivatively in the right and for the benefit of Novellus

12  to redress injuries suffered and to be suffered by Novellus as a direct result of defendants'

13  violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud,

14  gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting

15  thereof, by the Defendants.  This is not a collusive action to confer jurisdiction on this Court

16  which it would not otherwise have.

17    166.    Plaintiffs will adequately and fairly represent the interests of Novellus and its

18  shareholders in enforcing and prosecuting its rights.

19    167.    Plaintiffs are owners of Novellus stock and were owners of Novellus stock during

20  times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

21    168.    Prior demand upon a board of directors is excused if plaintiffs allege facts that, if

22  accepted as true, raise a reasonable doubt that: (a) the challenged transaction was the product of a

23  valid business judgment; or (b) a majority of the directors are disinterested and independent.  If

24  either prong of this test is satisfied, demand is excused.

25    169.    By reason of their corporate positions and their ability to control the business and

26  corporate affairs of Novellus at all relevant times, the directors of Novellus owed Novellus and its

27  stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were required to

28  use their ability to control Novellus in a fair, just and equitable manner, as well as to act in

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION          50
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1 | furtherance of the best interests of Novellus and its stockholders. In addition, the directors owed
2 | Novellus the fiduciary duty to exercise due care and diligence in the management and
3 | administration of the affairs of Novellus and in the use and preservation of its property and assets.
4 | In violation of their fiduciary duties, Defendants approved of and/or caused Novellus to issue
5 | illegally backdated stock options to many of its employees for a period beginning in at least 1997
6 | and continuing until no earlier than 2006.

7 | **Options Backdating is Not the Product of Business Judgment Because It is *Ultra Vires*, Illegal, and Contrary to the Stated Purpose of the Stock Option Plans**

170.    The practice of granting illegal and backdated stock options is not protected by the business judgment rule because it is *ultra vires*. The various Incentive Stock Option Plans under which these options were purportedly given, and the proxy statements disclosing grants to senior executives and directors during this time period, all represented and required that the stock grants in question be priced based on the fair market value of Novellus stock on the day of the grant.

171.    However, contrary to this limited authority given to the Board by Novellus' Stock Option Plans, and contrary to Novellus' representations in the proxy filings, many of Novellus' option grants between 1997 and 2006 were priced at a date earlier than the actual date on which they were granted. Because granting options using manipulated grant dates to lower the strike price of the options is not permitted by the Stock Option Plans, this conduct is *ultra vires* and void on its face. *Ultra vires* acts are not protected by the business judgment rule, and thus demand is excused.

172.    Additionally, Defendants' conduct caused Novellus to issue materially false financial reports and proxy reports for the entirety of the period in question, in violation of numerous provisions of the federal securities laws. Each defendant violated §10(b) and Rule 10b-5 of the Securities Exchange Act by participating in this fraudulent scheme. Each director defendant violated §14(a) of the Securities Exchange Act by issuing false and misleading proxy statements from 1996 to 2005. And each Director violated §20(a) of the Securities Exchange Act by being controlling persons of Novellus and engaging in the purchase and/or sale of Novellus stock while in the possession of material non-public information regarding Novellus' backdating scheme.

1  Demand is excused because these are illegal acts that are not protected by the business judgment
2  rule.

3      173.    Even if stock option backdating was not illegal, *ultra vires*, and void, there would
4  be no plausible argument that backdating stock options was a valid exercise of business judgment.
5  As represented in Novellus' proxy statements, the stated purpose of Novellus' Incentive Stock
6  Option Plans is to encourage the productivity of Novellus employees by providing compensation
7  that is proportional to gains in Novellus' stock price.  However, by granting options with
8  backdated strike prices, defendants undermined the purpose of the Stock Option Plans by
9  awarding employees compensation that had intrinsic value regardless of gains in Novellus' stock
10  price.  In effect, this practice was nothing more than secret handouts to executives and employees
11  at the expense of unsuspecting shareholders and the market at large.

12      174.    Defendants could have achieved the stated purpose of attracting and retaining
13  qualified employees by granting those employees additional options under their incentive plans, or
14  by granting options at a price less than the fair market value on the day of the grant and simply
15  disclosing and expensing these grants.  Instead, defendants intentionally concealed and illegally
16  reported these grants in their financial disclosures to improve their bottom line.

17      175.    Further, the practice of backdating stock options could not have been a valid
18  exercise of business judgment because it has subjected Novellus to potentially massive liability.
19  The Company's practices may well be investigated by the SEC and DOJ, if they are not already.
20  The Company will likely suffer tax liabilities for the additional compensation they will have to
21  expense, and they have tarnished their reputation in the investment community through this
22  deliberate and calculated conduct.

23  **A Majority of Novellus' Directors Are Not Independent and Disinterested**

24      176.    In addition to the fact that backdating stock options is not protected by the business
25  judgment rule, demand is excused because plaintiffs can show a reasonable doubt that the
26  majority of directors were not disinterested or independent at the time that this action was filed.
27  At the time that plaintiffs filed this action, Novellus' board consisted of Hill, Bonke, El-Mansy,
28  Litster, Nishi, Possley, Rhoads, Spivey, and Whitaker.

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION      52
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1    177.    Based upon the facts set forth throughout this Complaint, applicable law and the
2  longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon
3  the Novellus Board of Directors to institute this action against the officers and members of the
4  Novellus Board of Directors is excused as futile.  A pre-filing demand would be a useless and
5  futile act because:

6            (a)    During the Relevant Period, defendant Hill was the recipient of the stock
7  option grants which plaintiffs allege were backdated.  Because Hill received a personal benefit
8  from the challenged transaction, he is interested and unable to objectively consider a demand on
9  the Company.

10           (b)    The members of Novellus' Board have demonstrated their unwillingness
11  and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves
12  and/or their fellow directors and allies in the top ranks of the corporation for the violations of law
13  complained of herein.  For example, no actions have been taken against long-time officer and
14  member of the Board defendant Hill, or long time officer defendant Benzing, who has been an
15  officer at Novellus in various capacities since 1992, with regard to the excess returns generated by
16  the backdated options. Thus, despite these breaches of duty, the Board did not recommend that
17  any defendant be relieved of his duties as an officer or a director.  By maintaining the status quo
18  in light of these breaches of duty, the entire Board failed to exercise proper judgment.

19           (c)    Most egregiously, the Board has not required that at least defendants Hill
20  and Benzing immediately disgorge all of their ill-gotten gains from their improper manipulation of
21  their stock option grants and insider trading proceeds, has not required them to return all
22  unexecuted stock options to the Company insider trading proceeds, and has not required them to
23  disgorge their bonuses and equity-based compensation to the Company, despite their breaches of
24  fiduciary duties, which worked a direct harm to the Company.  Nor has the Board taken any other
25  action, including commencing legal proceedings, to protect the interests of the Company.

26           (d)    Based, in part, on their membership on the Novellus Board, the members of
27  the Novellus Board have developed professional relationships with, are friends with and have
28  entangling financial alliances, interests and dependencies with each other, and therefore, they are

1 | not able to and will not vigorously prosecute any such action. For example, the Board is unlikely
2 | to pursue any action against former director, defendant Guzy, who served as a director on the
3 | Board from 1990 to 2004 and served on the Stock Option Committee and Compensation
4 | Committee responsible for the administration of the Stock Option Plan during the years of
5 | backdating at Novellus. Guzy was also a director on the Intel Corp. Board of Directors ("Intel
6 | Board') and during his concurrent directorship from 2000-2002 on both the Intel and Novellus
7 | Boards, Intel purchased total products and services from Novellus in the amount of $489.0
8 | million.

9 |     (e)    These long-term business and professional relationships also mean that
10 | current directors are not disinterested. Defendant Possley has served on the Novellus Board for
11 | over 15 years, since 1991. Possley also served as president of SubMicron Technology, Inc. from
12 | June 1994 through December 1997, a company to which Novellus sold $25.6 million of products
13 | from 1996 to 1997. Possley also served on the Stock Option Committee and Compensation
14 | Committee during the period of backdating.

15 |     (f)    Defendant Hill's independence is compromised because as he serves
16 | concurrent roles of CEO and chairman of the Novellus Board, and has since 1993. Hill also
17 | received a relocation loan of $1.5 million in July 1997. The accrued interest on the loan was
18 | forgiven by Novellus in connection with the repayment of the loan in March 2000. Defendants
19 | Litster and Spivey have served on the Board with Possley and Hill since 1998 participating in the
20 | transactions associated with Possley and Hill.

21 |     (g)    In addition to the aforementioned inter-relationships and as a result of this
22 | long history on the Board and with Novellus, the long term directors dominate and control the
23 | other directors such that the more recently elected directors cannot act independently of them.
24 | This control also arises because each of these long-time Board members has either worked with
25 | each other or with various other Board members at other technology firms in a position of control
26 | and authority:

27 |
28 |

| Connecting Co. | Defendant | Novellus Position | Tenure @ Connecting Co. |
|---|---|---|---|
| Tektronix | Richard Hill | CEO (since 1993) Chair (since 1996) | 1981-1993: President, VP of Test & Measurement Group |
| | William R. Spivey | Board Member (since 1998) | Group President (1991-1994) |
| Motorola | Richard Hill | CEO (since 1993) Chair (since 1996) | Engineering & Management Positions (prior to 1981) |
| | Glen G. Possley | Director (Jul. 1991 – to date) | Engineering & Management Positions |
| General Electric | Richard Hill | CEO (since 1993) Chair (since 1996) | Engineering & Management Positions (prior to 1981) |
| | William R. Spivey | Board Member (since 1998) | 1970-1978 |
| | Delbert A. Whitaker | Board Member (since Mar. 2002) | Engineer (prior 1968) |
| Semiconductor Research Co. | Richard Hill | CEO (since 1993) Chair (since 1996) | Board Member |
| | Yoshio Nishi | Board Member (Nov. 2002 – to date) | Board Member (Past) |
| SEMI | Richard Hill | CEO (since 1993) Chair (since 1996) | Board Member (Past) |
| | Neil R. Bonke (SEMI Sematech) | Board Member | Board Member |
| Luminent | Richard Hill | CEO (since 1993) Chair (since 1996) | Director |
| | William R. Spivey | Board Member (since 1998) | President, CEO (Jul. 2000 – Sept. 2001) |
| SpeedFam-IPEC | Richard Hill | CEO (since 1993) Chair (since 1996) | Director (past) |
| | Neil R. Bonke | Board Member | Board member |
| Hewlett Packard | Jeffrey C. Benzing | Director (Nov. 1998) Various VP (1992-2002) | 1979-1984 |
| | Yoshio Nishi | Board Member (Nov. 2002 – to date) | Sr. Mgmt Positions (1986-1995) |
| AT&T | William H. Hurtz | VP & CFO (since Sept. 2005) | Various positions accounting, finance, VP Gen. Mgr (Jul. 1983 – Aug. 1998 |
| | William R. Spivey | Board Member (since 1998) | VP Systems & Components Group (1994 - 1997) |
| Texas Instruments | Yoshio Nishi | Board Member (Nov. 2002 - to date) | Sr. VP, Director of R&D (1995 – 2004) |
| | Glenn G. Possley | Director (Jul. 1991 – to date) | Manager, Engineer, Various Positions |
| | Delbert A. Whitaker | Board Member (since Mar. 2002) | Sr. VP |
| International Sematech | Yoshio Nishi | Board Member (Nov. 2002 – to date) | Board Member (past) |
| | Neil R. Bonke (SEMI Sematech) | Board Member | Board Member |

1                (h)      Because of the numerous interlocking management and directorial positions
2 shown above, it is highly unlikely that any of the defendants will recommend suit against each
3 other.

4                (i)      In addition to these connections, several current and recent Novellus
5 directors and executives are affiliated with other companies that that have been implicated in
6 options backdating. As the Corporate Library report found, the level of interconnectedness
7 between directors sitting on the boards of companies implicated in the options backdating scandal
8 was much higher than could be expected from a similar, randomly selected sample. This led them
9 to the conclusion that backdating stock options could have been spread by word of mouth, through
10 directors sitting on the boards of more than one company. The Corporate Library reported that
11 Novellus was one of the three most connected companies in this respect, as three current and
12 former directors and executives were connected to four companies that have been implicated in
13 options backdating.

14                (i)      Kevin S. Royal: Kevin S. Royal served as Novellus' CFO from
15 January 2002 to April 2005. He is now the CFO of Blue Coat Systems, Inc. ("Blue Coat"). Blue
16 Coat announced on August 3, 2006 that it has been informed by the SEC of an informal inquiry
17 into its stock option practices. On September 11, 2006, Blue Coat said it would take additional
18 and material non-cash stock-based compensation expenses relating to stock option award dates.
19 The company said the actual measurement dates of certain stock options granted primarily from
20 fiscal 2000 to 2004 differ from the recorded grant dates of the awards.

21                (ii)      Neil R. Bonke: Neil R. Bonke has been a director at Novellus since
22 2004. Bonke has also been a director of Sanmina-SCI since 2004. On September 13, 2006,
23 Sanmina announced that it will restate its financial results for periods as far back as 2002, and will
24 incur additional, material charges in those periods because of errors in accounting for past stock
25 option grants. On October 12, 2006 the company said a U.S. grand jury is probing its stock option
26 grant practices, adding that its own internal probe found that most option grants to executives and
27 employees weren't correctly dated or accounted for since 1997. Sanmina said it plans to restate its
28 historical results and record noncash compensation charges. The company's four-month

1  investigation found that a former executive and a current manager improperly dated or accounted
2  stock options from 1997 to 2006.

3          (iii)          William H. Kurtz: William H. Kurtz has been CFO of Novellus
4  since 2005. He is currently a member of the board of directors and chair of the audit committee at
5  PMC-Sierra and Redback Networks. PMC-Sierra recently concluded that the company used
6  incorrect accounting measurement dates for certain stock-option grants awarded primarily during
7  the years 1998-2001. On November 9, 2006, PMC-Sierra disclosed that the SEC has begun an
8  informal inquiry into its past stock-option-granting practices. On June 30, Redback Networks said
9  it received an informal request from the SEC for information related to historical stock option
10  grants. The company said it was also subpoenaed by the U.S. Attorney for the Northern District of
11  California related to stock option grants.

12          (j)          The Stock Option and Compensation Committee was at all relevant times
13  responsible for overseeing the Company's compensation, employee benefit and stock option
14  plans.   It was also responsible for supervising incentive compensation programs for the
15  Company's employees. The members of the Stock Option and Compensation Committee, and the
16  Board by its approval of their recommendations, enabled, or through conscious abdication of duty,
17  permitted the Company to backdate stock option grants issued to certain Defendants. By such
18  actions, Defendants breached their fiduciary duties to the Company. The backdating of stock
19  option grants was in direct violation of the stock option plans. Thus, there is reasonable doubt that
20  the members of the Stock Option and Compensation Committee, defendants Possley, Litster,
21  Spivey, El-Mansy, Nishi, and Whitaker are disinterested;

22          (k)          The Audit Committee was responsible for overseeing the accounting and
23  financial reporting processes of the Company, the audits of the Company's financial statements,
24  and the Company's internal control over financial reporting.   The members of the Audit
25  Committee, and the Board by its approval of their actions and recommendations, enabled, or
26  through conscious abdication of duty, permitted the Company to backdate stock option grants
27  issued to certain Defendants. By such actions, Defendants breached their fiduciary duties to the

28

Company.  Thus, there is reasonable doubt that the members of the Audit Committee, defendants Whitaker, Rhoads, Bonke, and Possley are disinterested.

(l)     The following chart shows the makeup of the Board of Directors and committee assignments at Novellus from 1994 to 2005:

| | Smith | Long | Guzy | Spivey | Litster | Whitaker | Nishi | Rhoads | Bonke | El-Mansy | Hill | Possley |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1994 | | | AC, SOC | | | | | | | | CC | SOC |
| 1995 | AC, SOC | SOC | AC, CC, SOC | | | | | | | | CC | ✓ |
| 1996 | AC, CC | CC, SOC | AC, CC, SOC | | | | | | | | ✓ | ✓ |
| 1997 | ✓ | ✓ | AC, CC, SOC | | | | | | | | ✓ | CC, SOC |
| 1998 | ✓ | SOCC | SOCC | SOCC | AC, SOCC | | | | | | ✓ | AC, SOCC |
| 1999 | ✓ | SOCC | SOCC | SOCC | AC, SOCC | | | | | | ✓ | AC, SOCC |
| 2000 | ✓ | AC, SOCC | AC, SOCC | AC, SOCC | SOCC | | | | | | ✓ | SOCC |
| 2001 | ✓ | AC, SOCC | AC, SOCC | AC, SOCC | SOCC | | | | | | ✓ | SOCC |
| 2002 | | | AC | SOCC | AC | AC | SOCC | | | | ✓ | SOCC |
| 2003 | | | AC, GNC | SOCC, GNC | SOCC | SOCC, GNC | SOCC, GNC | AC | | | ✓ | AC |
| 2004 | | | AC, GNC | SOCC | SOCC, GNC | SOCC, GNC | SOCC, GNC | AC | AC | SOCC, GNC | ✓ | AC |
| 2005 | | | | SOCC, GNC | SOCC, GNC | AC, SOCC, GNC | SOCC, GNC | AC | AC | SOCC, GNC | ✓ | AC |

✓ = Member of the Board of Directors but not assigned to a committee
AC = Member of the Audit Committee
SOC = Member of the Stock Option Committee
CC = Member of the Compensation Committee
SSOC = Member of the Stock Option and Compensation Committee
GNC = Member of the Governance and Nominations Committee

(m)     The Novellus Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who also did.

1          (n)     The Novellus Board of Directors and senior management participated in,
2   approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts
3   to conceal or disguise those wrongs from Novellus' stockholders or recklessly and/or negligently
4   disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a
5   result of their access to and review of internal corporate documents, or conversations and
6   connections with other corporate officers, employees, and directors and attendance at management
7   and/or Board meetings, each of the Defendants knew the adverse non-public information
8   regarding the improper stock option grants and financial reporting.  Pursuant to their specific
9   duties as Board members, the Director Defendants are charged with the management of the
10  Company and to conduct its business affairs.  Defendants breached the fiduciary duties that they
11  owed to Novellus and its shareholders in that they failed to prevent and correct the improper stock
12  option granting and financial reporting;

13         (o)     During the Relevant Period, the Defendants authorized the filing of Proxy
14  Statements, in support of their nomination as Directors, which failed to disclose that certain
15  Directors' stock options had been backdated.  They also authorized the filing of shareholder
16  approved stock option plans, which misrepresented that the options carry the stock price of the
17  day of the award. Any suit by the Defendants to remedy the wrongs complained of herein could
18  also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly
19  conflicted in making any supposedly independent determination of a demand that they cause the
20  Company to bring this action;

21         (p)     All of the Defendants signed one or more of the Company's Annual
22  Reports during the Relevant Period, which contained the Company's financial statements , which
23  failed to account for the backdated stock options as compensation and an expense of the
24  Company. As a result, those financial statements of the Company may have overstated its profits
25  and may need to be restated.  Any suit by the Defendants to remedy the wrongs complained of
26  herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in
27  making any supposedly independent determination of a demand that they cause the Company to
28  bring this action;

1           (q)     The acts complained of constitute violations of the fiduciary duties owed by

2 Novellus' officers and directors and these acts are incapable of ratification;

3           (r)     The members of Novellus' Board have benefited, and will continue to

4 benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their

5 positions of control and the perquisites derived thereof, and are incapable of exercising

6 independent objective judgment in deciding whether to bring this action.

7           (s)     Any suit by the current directors of Novellus to remedy these wrongs would

8 likely further expose the liability of Defendants under the federal securities laws, which could

9 result in additional civil and/or criminal actions being filed against one or more of the Defendants,

10 thus, they are hopelessly conflicted in making any supposedly independent determination whether

11 to sue themselves;

12           (t)     Novellus has been and will continue to be exposed to significant losses due

13 to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against

14 itself or others who were responsible for that wrongful conduct to attempt to recover for Novellus

15 any part of the damages Novellus suffered and will suffer thereby;

16           (u)     In order to properly prosecute this lawsuit, it would be necessary for the

17 directors to sue themselves and the other Defendants, requiring them to expose themselves and

18 their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS

19 penalties. This they will not do.

20           (v)     Novellus' current and past officers and directors are protected against

21 personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in

22 this Complaint by directors' and officers' liability insurance which they caused the Company to

23 purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of

24 Novellus. However, due to certain changes in the language of directors' and officers' liability

25 insurance policies in the past few years, the directors' and officers' liability insurance policies

26 covering the Defendants in this case contain provisions which eliminate coverage for any action

27 brought directly by Novellus against these Defendants, known as, inter alia, the "insured versus

28 insured exclusion." As a result, if these directors were to sue themselves or certain of the officers

1    of Novellus, there would be no directors' and officers' insurance protection and thus, this is a

2    further reason why they will not bring such a suit.  On the other hand, if the suit is brought

3    derivatively, as this action is brought, such insurance coverage exists and will provide a basis for

4    the Company to effectuate a recovery;

5              (w)    In order to bring this action for breaching their fiduciary duties, the

6    members of the Novellus Board would have been required to sue themselves and/or their fellow

7    directors and allies in the top ranks of the Company, who are their personal friends and with

8    whom they have entangling financial alliances, interests and dependencies, which they would not

9    do.

10            178.    Plaintiffs have not made any demand on shareholders of Novellus to institute this

11   action since such demand would be a futile and useless act for the following reasons:

12            (a)    Novellus is a publicly traded company with approximately 127 million

13   shares outstanding, and thousands of shareholders;

14            (b)    Making demand on such a number of shareholders would be impossible for

15   plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders;

16   and

17            (c)    Making demand on all shareholders would force plaintiffs to incur huge

18   expenses, assuming all shareholders could be individually identified.

19                                          **COUNT I**
                     **Violations of Section 10(b) And Rule 10b-5 of the Exchange Act**
20                                    **Against All Defendants**

21            179.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

22   above, as though fully set forth herein.

23            180.    Throughout the Relevant Period, Defendants individually and in concert, directly

24   and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the

25   mails, engaged and participated in a continuous course of conduct designed to divert hundreds of

26   millions of dollars to Defendants via improper option grants.

27            181.    Defendants employed devices, schemes and artifices to defraud while in possession

28   of material, adverse non-public information and engaged in acts, practices and a course of conduct

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION          61
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1  that included the making of, or participation in the making of, untrue and/or misleading statements
2  of material facts and/or omitting to state material facts necessary in order to make the statements
3  made about Novellus not misleading.

4      182.    Defendants, as top executive officers and directors of the Company, are liable as
5  direct participants in the wrongs complained of herein. Through their positions of control and
6  authority as officers of the Company, each of the Defendants was able to and did control the
7  conduct complained of herein and the content of the public statements disseminated by Novellus.

8      183.    Defendants acted with scienter throughout the Relevant Period, in that they either
9  had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein,
10  or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true
11  facts, even though such facts were available to them. Defendants were among the senior
12  management of the Company, and were therefore directly responsible for the false and misleading
13  statements and/or omissions disseminated to the public through press releases, news reports and
14  filings with the SEC.

15     184.    Each of the Defendants participated in a scheme to defraud with the purpose and
16  effect of defrauding Novellus.

17     185.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act,
18  and Rule 10b-5 promulgated thereunder.

19                              **COUNT II**
                **Violations of Section 14(a) of the Exchange Act**
20                          **Against All Defendants**

21     186.    Plaintiffs incorporate by reference and realleges each and every allegation set forth
22  above, as though fully set forth herein.

23     187.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no
24  proxy statement shall contain "any statement which, at the time and in the light of the
25  circumstances under which it is made, is false or misleading with respect to any material fact, or
26  which omits to state any material fact necessary in order to make the statements therein not false
27  or misleading." 17 C.F.R. §240.14a-9.

28

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION          62
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1    188.    The 1996-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they
2  omitted material facts, including the fact that Defendants were causing Novellus to engage in an
3  option backdating scheme, a fact which Defendants were aware of and participated in from at
4  least 1997.

5    189.    In the exercise of reasonable care, Defendants should have known that the Proxy
6  Statements were materially false and misleading.

7    190.    The misrepresentations and omissions in the Proxy Statements were material to
8  plaintiff in voting on each Proxy Statement. The Proxy Statements were an essential link in the
9  accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as
10  revelations of the truth would have immediately thwarted a continuation of shareholders'
11  endorsement of the directors' positions, the executive officers' compensation and the Company's
12  compensation policies.

13    191.    The Company was damaged as a result of the material misrepresentations and
14  omissions in the Proxy Statements.

15
16

**COUNT III**
**Violations of Section 20(A) of the Exchange Act**
**Against All Defendants**

17    192.    Plaintiffs incorporate by reference and realleges each and every allegation set forth
18  above, as though fully set forth herein.

19    193.    The Defendants, by virtue of their positions with Novellus and their specific acts,
20  were, at the time of the wrongs alleged herein, controlling persons of Novellus within the meaning
21  of §20(a) of the Exchange Act. They had the power and influence and exercised the same to
22  cause Novellus to engage in the illegal conduct and practices complained of herein.

23
24

**COUNT IV**
**Accounting**

25

194.    Plaintiffs incorporate by reference and realleges each and every allegation set forth
above, as though fully set forth herein.

26
27

195.    At all relevant times, Defendants, as directors and/or officers of Novellus, owed the
Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

28

1    196.    In breach of their fiduciary duties owed to Novellus and its shareholders, the

2  Defendants caused Novellus, among other things, to grant backdated stock options to themselves

3  and/or certain other officers and directors of Novellus.  By this wrongdoing, the Defendants

4  breached their fiduciary duties owed to Novellus and its shareholders.

5    197.    The Defendants possess complete and unfettered control over their improperly

6  issued stock option grants and the books and records of the Company concerning the details of

7  such improperly backdated stock option grants to the Defendants.

8    198.    As a result of Defendants' misconduct, Novellus has been substantially injured and

9  damaged financially and is entitled to a recovery as a result thereof, including the proceeds of

10  those improperly granted options which have been exercised and sold.

11    199.    Plaintiffs demands an accounting be made of all stock option grants made to

12  Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the

13  value of the grants, the recipients of the grants, the exercise date of stock options granted to the

14  Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other

15  exercise of backdated stock option grants received by the Defendants.

16                            **COUNT V**
                **Breach of Fiduciary Duty and/or Aiding And Abetting**
17                        **Against All Defendants**

18    200.    Plaintiffs incorporate by reference and realleges each and every allegation set forth

19  above, as though fully set forth herein.

20    201.    Each of the Defendants agreed to and did participate with Hill and Benzing and the

21  other Defendants and/or aided and abetted one another in a deliberate course of action designed to

22  divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

23    202.    The Defendants have violated fiduciary duties of care, loyalty, candor and

24  independence owed to Novellus and its public shareholders, have engaged in unlawful self-

25  dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the

26  interests of Novellus and its shareholders.

27    203.    As demonstrated by the allegations above, Defendants failed to exercise the care

28  required, and breached their duties of loyalty, good faith, candor and independence owed to

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION       64
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**

1 | Novellus and its public shareholders, and they failed to disclose material information and/or made
2 | material misrepresentations to shareholders regarding Defendants' option backdating scheme.

3 | 204. By reason of the foregoing acts, practices and course of conduct, the Defendants
4 | have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations
5 | toward Novellus and its public shareholders.

6 | 205. As a proximate result of Defendants' conduct, in concert with Hill and Benzing,
7 | Novellus has been injured and is entitled to damages.

8 | **COUNT VI**
**Abuse of Control**
9 | **Against All Defendants**

10 | 206. Plaintiffs incorporate by reference and realleges each and every allegation set forth
11 | above, as though fully set forth herein.

12 | 207. The Defendants employed the alleged scheme for the purpose of maintaining and
13 | entrenching themselves in their positions of power, prestige and profit at, and control over,
14 | Novellus, and to continue to receive the substantial benefits, salaries and emoluments associated
15 | with their positions at Novellus. As a part of this scheme, Defendants actively made and/or
16 | participated in the making of or aided and abetted the making of, misrepresentations regarding
17 | Novellus.

18 | 208. Defendants' conduct constituted an abuse of their ability to control and influence
19 | Novellus.

20 | 209. By reason of the foregoing, Novellus has been damaged.

21 | **COUNT VII**
**Gross Mismanagement**
22 | **Against All Defendants**

23 | 210. Plaintiffs incorporate by reference and realleges each and every allegation set forth
24 | above, as though fully set forth herein.

25 | 211. Defendants had a duty to Novellus and its shareholders to prudently supervise,
26 | manage and control the operations, business and internal financial accounting and disclosure
27 | controls of Novellus.

28 |

1    212.    Defendants, by their actions and by engaging in the wrongdoing described herein,

2    abandoned and abdicated their responsibilities and duties with regard to prudently managing the

3    businesses of Novellus in a manner consistent with the duties imposed upon them by law.  By

4    committing the misconduct alleged herein, Defendants breached their duties of due care, diligence

5    and candor in the management and administration of Novellus' affairs and in the use and

6    preservation of Novellus' assets.

7    213.    During the course of the discharge of their duties, Defendants knew or recklessly

8    disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

9    caused Novellus to engage in the scheme complained of herein which they knew had an

10   unreasonable risk of damage to Novellus, thus breaching their duties to the Company.  As a result,

11   Defendants grossly mismanaged Novellus.

12   214.    By reason of the foregoing, Novellus has been damaged.

### COUNT VIII
### Constructive Fraud
### Against All Defendants

15   215.    Plaintiffs incorporate by reference and realleges each and every allegation set forth

16   above, as though fully set forth herein.

17   216.    As corporate fiduciaries, Defendants owed to Novellus and its shareholders a duty

18   of candor and full accurate disclosure regarding the true state of Novellus' business and assets and

19   their conduct with regard thereto.

20   217.    As a result of the conduct complained of, Defendants made, or aided and abetted

21   the making of, numerous misrepresentations to and/or concealed material facts from Novellus'

22   shareholders despite their duties to, inter alia, disclose the true facts regarding their stewardship of

23   Novellus.  Thus they have committed constructive fraud and violated their duty of candor.

24   218.    By reason of the foregoing, Novellus has been damaged.

### COUNT IX
### Corporate Waste
### Against All Defendants

27   219.    Plaintiffs incorporate by reference and realleges each and every allegation set forth

28   above, as though fully set forth herein.

1    220.    By failing to properly consider the interests of the Company and its public
2  shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to
3  Defendants via the option backdating scheme, Defendants have caused Novellus to waste valuable
4  corporate assets.

5    221.    As a result of Defendants' corporate waste, they are liable to the Company.

6                                          **COUNT X**
                                       **Unjust Enrichment**
7                                      **Against All Defendants**

8    222.    Plaintiffs incorporate by reference and realleges each and every allegation set forth
9  above, as though fully set forth herein.

10    223.    As a result of the conduct described above, Defendants will be and have been
11  unjustly enriched at the expense of Novellus, in the form of unjustified salaries, benefits, bonuses,
12  stock option grants and other emoluments of office.

13    224.    Certain Defendants also obtained severance benefits that were not earned or
14  justified but were instead paid as part of a scheme to cover up Defendants' complicity in the
15  scheme.

16    225.    All the payments and benefits provided to the Defendants were at the expense of
17  Novellus.  The Company received no benefit from these payments.  Novellus was damaged by
18  such payments.

19    226.    Certain of the Defendants sold Novellus stock for a profit during the period of
20  deception, misusing confidential non-public corporate information.  These Defendants should be
21  required to disgorge the gains which they have and/or will otherwise unjustly obtain at the
22  expense of Novellus.  A constructive trust for the benefit of the Company should be imposed
23  thereon.

24                                          **COUNT XI**
                                       **Against All Defendants**
25                                       **For Rescission**

26    227.    Plaintiffs incorporate by reference and realleges each and every allegation
27  contained above as though fully set forth herein.

28

1  228.  As a result of the acts alleged herein, the stock option contracts between the Officer
2  Defendants and Novellus entered into during the Relevant Period were obtained through
3  Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal
4  grants and thus invalid as they were not authorized in accordance with the terms of the publicly
5  filed contracts regarding the Officer Defendants' employment agreements and the Company's
6  stock option plan which was also approved by Novellus shareholders and filed with the SEC.

7  229.  All contracts which provide for stock option grants between the Officer Defendants
8  and Novellus and were entered into during the Relevant Period should, therefore, be rescinded,
9  with all sums paid under such contracts returned to the Company, and all such executory contracts
10  cancelled and declared void.

11  **COUNT XII**
**Against The Insider Selling Defendants**
12  **For Violation of California Corporations Code Section 25402**

13  230.  Plaintiffs incorporate by reference and realleges each and every allegation set forth
14  above, as though fully set forth herein.

15  231.  At the time that the Insider Selling Defendants sold their Novellus common stock
16  as set forth herein at 54, by reason of their high executive and/or directorial positions with
17  Novellus, the Insider Selling Defendants had access to highly material information regarding the
18  Company, including the information set forth herein regarding the true adverse facts of Novellus'
19  improper accounting.

20  232.  At the time of such sales, that information was not generally available to the public
21  or the securities markets.  Had such information been generally available, it would have
22  significantly reduced the market price of Novellus shares at that time.

23  233.  The Insider Selling Defendants, and each of them, had actual knowledge of
24  material, adverse non-public information and thus sold their Novellus common stock in California
25  in violation of California Corporations Code §25402.

26  234.  Pursuant to California Corporations Code §25502.5, the Insider Selling
27  Defendants, and each of them, are liable to Novellus for damages in an amount up to three times
28  the difference between the price at which Novellus common stock was sold by these defendants,

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - **C-06-03514-RMW**          68

1 | and each of them, and the market value which Novellus common stock would have had at the time

2 | of the sale if the information known to these defendants, and each of them, had been publicly

3 | disseminated prior to that time and a reasonable time had elapsed for the market to absorb the

4 | information.

5 |
**COUNT XIII**
**Against the Insider Selling Defendants**
6 | **For Breach of Fiduciary Duties For Insider Selling and Misappropriation of Information**

7 |     235.    Plaintiffs incorporate by reference and realleges each and every allegation set forth

8 | above, as though fully set forth herein.

9 |     236.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew

10 | the information described above, and sold Novellus common stock on the basis of such

11 | information.

12 |     237.    The information described above was proprietary non-public information

13 | concerning the Company's financial condition and future business prospects. It was a proprietary

14 | asset belonging to the Company, which the Insider Selling Defendants used for their own benefit

15 | when they sold Novellus common stock.

16 |     238.    At the time of their stock sales, the Insider Selling Defendants knew that the

17 | Company's revenues were materially overstated.  The Insider Selling Defendants' sales of

18 | Novellus common stock while in possession and control of this material adverse non-public

19 | information was a breach of their fiduciary duties of loyalty and good faith.

20 |     239.    Since the use of the Company's proprietary information for their own gain

21 | constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to

22 | the imposition of a constructive trust on any profits the Insider Selling Defendants obtained

23 | thereby.

24 |     **PRAYER FOR RELIEF**

25 |     WHEREFORE, plaintiffs demands judgment as follows:

26 |     A.    Awarding money damages against all Defendants, jointly and severally, for all

27 | losses and damages suffered as a result of the acts and transactions complained of herein, together

28 | with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

1  B.  Directing all Defendants to account for all damages caused by them and all profits
2  and special benefits and unjust enrichment they have obtained as a result of their unlawful
3  conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale
4  proceeds and imposing a constructive trust thereon;

5  C.  Directing Novellus to take all necessary actions to reform and improve its
6  corporate governance and internal control procedures to comply with applicable law, including,
7  but not limited to, putting forward for a shareholder vote resolutions for amendments to the
8  Company's By-Laws or Articles of Incorporation and taking such other action as may be
9  necessary to place before shareholders for a vote adoption of the following Corporate Governance
10  policies:

11  (ii)  a proposal requiring that the office of CEO of Novellus and
12  Chairman of the Novellus Board of Directors be permanently held by separate individuals and that
13  the Chairman of the Novellus Board meets rigorous "independent" standards;

14  (iii)  a proposal to strengthen the Novellus Board's supervision of
15  operations and develop and implement procedures for greater shareholder input into the policies
16  and guidelines of the Board;

17  (iv)  appropriately test and then strengthen the internal audit and control
18  function;

19  (v)  rotate independent auditing firms every five years;

20  (vi)  control and limit insider stock selling and the terms and timing of
21  stock option grants; and

22  (vii)  reform executive compensation.

23  (viii)  Ordering the imposition of a constructive trust over Defendants'
24  stock options and any proceeds derived therefrom;

25  (ix)  Awarding punitive damages;

26  (x)  Awarding costs and disbursements of this action, including
27  reasonable attorneys', accountants', and experts' fees; and

28

1          (xi)          Granting such other and further relief as this Court may deem just

2    and proper.

3                                    **JURY DEMAND**

4          Plaintiffs demand a trial by jury.

5    DATED: December 8, 2006                    LERACH COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
6                                               SHAWN A. WILLIAMS

7                                               _____/s/_____
                                                          SHAWN A. WILLIAMS
8
                                                100 Pine Street, Suite 2600
9                                               San Francisco, CA 94111
                                                Telephone: 415/288-4545
10                                              415/288-4534 (fax)

11                                              LERACH COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
12                                              TRAVIS E. DOWNS III
                                                BENNY C. GOODMAN III
13                                              THOMAS G. WILHELM
                                                655 West Broadway, Suite 1900
14                                              San Diego, CA 92101
                                                Telephone: 619/231-1058
15                                              619/231-7423 (fax)

16                                              Attorneys for Plaintiff

17

18

19

20   T:\CasesSF\Novellus Derivative\CPT00037259_REDACTED.doc

21

22

23

24

25

26

27

28

1

VERIFICATION

2   I, SHAWN A. WILLIAMS, hereby declare as follows:

3   1.   I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman &

4   Robbins, LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing

5   complaint and know the contents thereof. I am informed and believe the matters therein are true

6   and on that ground allege that the matters stated therein are true.

7   2.   I make this Verification because plaintiff is absent from the County of San

8   Francisco where I maintain my office.

9   Executed this 8th day of December 2006 at San Francisco, California.

10

11                                   /s/
                                    _____
                                    SHAWN A. WILLIAMS

12

13

14   T:\CasesSF\Novellus Derivative\CPT00037259_REDACTED.doc

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03514-RMW          - 1 -

1          CERTIFICATE OF SERVICE

2          I hereby certify that on December 8, 2006, I electronically filed the foregoing with the Clerk

3   of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5   mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6   participants indicated on the attached Manual Notice List.

7

8                                                        /s/
                                               SHAWN A. WILLIAMS

9                                              Lerach Coughlin Stoia Geller Rudman &
                                               Robbins LLP
10                                             100 Pine Street, 26th Floor
                                               San Francisco, CA  94111
11                                             Telephone:  415/288-4545
                                               415/288-4534 (fax)
12                                             E-mail:Swilliams@lerachlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:06-cv-03514-RMW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis A. Bottini, Jr**
  bottini@whafh.com

- **Travis E. Downs, III**
  travisd@lerachlaw.com e_file_sd@lerachlaw.com

- **Francis M. Gregorek**
  gregorek@whafh.com

- **Sunil R. Kulkarni**
  skulkarni@mofo.com msousa@mofo.com

- **William S. Lerach**
  e_file_sf@lerachlaw.com

- **Betsy C. Manifold**
  manifold@whafh.com

- **Maria V. Morris**
  mariam@lerachlaw.com e_file_sf@lerachlaw.com

- **Rachele R. Rickert**
  rickert@whafh.com

- **Darren J. Robbins**

- **Shawn A. Williams**
  shawnw@lerachlaw.com
  e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com;AelishB@lerachlaw.com;MoniqueW@lerach

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Betsy C Maniford
Wolf Holdenstein Adler Freeman & Herz LLP
Symphony Tower
Suite 2770
750 B. Street
San Diego, CA 92101
```